**NORTH BRITISH & MERCANTILE INS. CO., Ltd., v. CROWLEY et al.**

**QUEEN INS. CO. OF AMERICA v. SAME.**

**Nos. 5638, 5639.**

Circuit Court of Appeals, Fourth Circuit.

Nov. 10, 1947.

---

[6] § 747(a), Title 8 U.S.C.A.    [7] § 747(a), Title 8 U.S.C.A.

Stephen Nettles, of Greenville, S.C., and Sam R. Watt, of Spartanburg, S. C. (Jos. L. Nettles, of Columbia, S. C., on the brief), for appellants.

C. Erskine Daniel and J. Davis Kerr, both of Spartanburg, S. C., for appellees.

Before PARKER, SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

The appeals in these cases were taken from two judgments of $37,500 each, with interest, recovered by the plaintiffs on two identical fire insurance policies issued by the two defendant companies. By agreement, the two cases were consolidated for trial and were heard by the trial judge without a jury. The opinion of the District Court may be found at W.D.S.C., 1947, 70 F.Supp. 547, 549.

Plaintiffs are waste merchants engaged as partners in the business of buying and selling waste, a by-product of the textile manufacturing mills. This waste, mostly cotton, the plaintiffs remove from the mills and store in warehouses until its resale to users throughout the country. The waste is classified according to type and is bought and sold in bales. As found by the trial judge, "While most of the mills use presses turning out bales averaging 500 pounds, there is variation among the mills in size and capacity of presses used. Dealers (in waste), through experience, know the average weight bale produced by the respective mills from which they purchase. Plaintiffs, as is customary with dealers, occasionally tear down incoming bales to sort out and separate the better from the lower types, which are separately rebaled. This varies the types, but poundage remains constant." At other times the waste merchants, including the plaintiffs, ship directly from the mills to the purchaser and waste so shipped never enters their warehouses.

For the purposes of storage, the plaintiffs owned two warehouses in Spartanburg, South Carolina, one known as the Exchange Street Warehouse, and the other, a smaller "overflow" warehouse, known as the Fair Grounds Warehouse. They also made use of a public warehouse in Thomason, Georgia.

The merchandise in the Exchange Street Warehouse was insured against loss and damage from fire by the two defendant insurance companies (hereinafter called the defendants) to the extent of $37,500 each.

Among other provisions, the insurance policies contained the following:

"Requirements in Case Loss Occurs. The insured shall * * * furnish a complete inventory of the destroyed, damaged and undamaged property, showing in detail quantities, costs, actual cash value and amount of loss claimed; and within sixty days after the loss, * * * the insured shall render to this Company a proof of loss, signed and sworn to by the insured, stating * * * the interest of the insured and of all others in the property, the actual cash value of each item thereof and the amount of loss thereto * * *. The insured, as often as may be reasonably required, * * * shall produce for exam-

ination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this Company or its representative, and shall permit extracts and copies thereof to be made.

"Suit. No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within twelve months next after inception of the loss."

Upon the construction of these two provisions hinges the determination of the instant cases.

As found by the trial judge, the insurance policies in question "are of the type known in the insurance field as the 'monthly reporting form' designed to afford the requisite flexibility of coverage and premium incident to a constantly changing value of merchandise insured." The premiums are determined by means of monthly reports rendered by the insured as to the value of the merchandise on hand in the particular warehouse. From June through November, 1944, plaintiffs reported the values of the waste stored in the Exchange Street Warehouse as follows: June 30, $69,100; July 31, $71,000; August 31, $74,000; September 30, $72,600; October 31, $73,600; November 30, $71,100.

On December 20, 1944, a fire completely destroyed the Exchange Street Warehouse, together with the waste stored therein. The plaintiffs, however, lost none of their records in the fire.

The plaintiffs gave notice, filed proofs of loss, and otherwise complied with the conditions of the policy. They also opened to the insurance adjusters and their auditor all their books and records concerning the property destroyed in the fire. These records consisted of sales book, purchase book, cash book, general ledger, accounts receivable book, accounts payable book, two shipping books, purchase and sales invoices, freight bills (except where deliveries to the warehouse were made by truck) and a separate set of stock cards for each of the three warehouses in which plaintiffs stored their waste. On these stock cards, which were kept according to the type and grade of waste, were itemized the number of bales received into, and shipped from, each warehouse, and each card bore the name of the warehouse to which it applied.

The plaintiffs compiled their proofs of loss by tabulating and balancing the stock cards of the Exchange Street Warehouse, and in that way they arrived at the number of bales of each type. Then from the invoices they averaged the weight per bale of each particular type over a period of several months. By multiplying the average weight by the number of bales, they reached the total weight of each type of waste in the warehouse at the time of the fire. From their "actual knowledge in trading in the waste business" they "applied a price that would be a fair value" to each grade of merchandise. By this method the total value of the waste destroyed by the fire was reached.

The defendants' auditor, Dawson, undertook the task of verifying the proofs of loss against the plaintiffs' books. The usual method employed in such a check was to begin with an opening inventory, as of the first of the year (here, January 1, 1944), to add subsequent purchases and then to subtract subsequent sales until the date of the fire. In that way the amount of the loss could be accurately ascertained. The plaintiffs, however, kept no receiving book which showed the merchandise that went into the Exchange Street Warehouse after the opening inventory of January 1, 1944. The only record of what was received at the warehouse was the stock card file. The defendants' accountant examined the card system and concluded that it was too incomplete and inaccurate to give a true picture of what had been received into the warehouse and what was on hand at the time of the fire. He accordingly refused to approve the proofs of loss.

His specific criticisms of the cards were that some were missing; they did not show the bale weight or the aggregate weight of a shipment; they did not show the value of a bale; and finally, they did not reflect the breaking up and resorting of certain bales.

In the meantime, the plaintiffs employed a certified public accountant, Dodge, to assist the defendants' accountant in the compilation and verification of the proofs of loss. The two auditors conferred and agreed that the normal method of determining the loss (outlined above) could not be followed.

The plaintiffs' auditor, Dodge, thereupon worked out his own method. He took the claims presented by the plaintiffs to the insurance companies and ascertained that they came primarily from the stock cards. He then located the invoices and bills of lading for those cards and attached them to the applicable cards; thus he placed a particular type and amount of waste as within the warehouse. To find out whether those goods had been shipped out, he checked the shipping book. If there was no entry of a shipment, he concluded that the goods in question must have been in the warehouse at the time of the fire. Inasmuch as there were no bills of lading for the shipments by truck, the only way to discover which warehouse received the trucked waste was to rely upon the statements of one of the partners.

Employing this method, Dodge concluded that plaintiffs had lost 909,205 pounds of waste in the fire. In their proofs of loss plaintiffs had claimed 896,276 pounds destroyed. Or, in other words, Dodge's result was a net dollar increase of $367.44 over the amount of the actual claim.

The defendants' accountant, Dawson, utterly rejected Dodge's method and refused to examine and check the results of his work, although Dodge offered him his tabulated findings, together with the supporting records, and invited Dawson to audit them and to point out his objections.

Because of the inability of the two auditors to reconcile their differences, the defendant companies, although admitting the total destruction of the property covered by their policies, refused to make any payment whatsoever until the plaintiff's records established the exact loss in the manner prescribed by the policies. As a result of this refusal by defendants, plaintiffs instituted the present action. The defendants asserted their non-liability on the grounds that the plaintiffs, by their failure to fix exactly the amount of the destruction, have breached the terms and conditions of the policy.

At a pre-trial conference, the defendants requested that the trial judge order an independent audit made by a disinterested accountant. The trial judge ordered this audit at the defendants' expense, appointed the accounting firm of Winn & Winn to make it, and granted a continuance of the trial.

Winn & Winn determined the poundage on hand the day of the fire substantially as indicated below. They took the opening inventory of January 1, 1944, and from it they set up their own stock record cards. Then, by examining all the purchase and sales invoices which they found in the records of the Company for the period involved, they added purchases and subtracted sales. By this method they arrived at a provisional poundage owned by the partnership on the day of the fire which would be accurate except for two factors: (1) purchase and sales invoices did not describe the type of waste in sufficient detail to insure accurate classification, and (2) because of the sorting operation at the warehouse, large quantities of waste purchased under one classification were resold under another. Furthermore, these auditors were unable to determine whether this poundage was all stored at the Exchange Street Warehouse or in one of the other warehouses or whether it was in transit. Accordingly, they were not able to give a certified statement of the amount of the loss.

In reaching their conclusions, Winn & Winn did not take into consideration the card record system maintained by the plaintiffs. They did, however, find "the general books of the company and the files of supporting invoices to be in very good order."

The Winn & Winn report shows as on hand the day of the fire a provisional total of 1,254,732 pounds of waste, plus, 2,800 bundles of ties and 57 unidentified bales. It also shows more than 18,000,000 pounds of waste bought and sold during the period involved.

As the trial court found by test-checking the Winn total by the Dodge method and by deducting the amounts stored in the other two warehouses as recorded on their stock card systems, the Winn report automatically allocated to the Exchange Street Warehouse a provisional total of approximately 915,000 pounds.

From these facts the trial court concluded that the plaintiffs had at least as much waste destroyed in the fire as they claimed in their proofs of loss. Accordingly, judgment was entered against each defendant insurance company for the sum of $37,500, with six percent interest from March 15, 1945, and costs.

The first contention of defendants urged upon us as ground for reversal of the lower court is that the effect of the "requirements in case of loss" and the "suit" provisions of the policies (set out above) is to require the insured to furnish the insurer with a full and precise inventory of all the property in the insured building at the time of the fire, setting forth in detail quantities, costs, actual cost value, and amount of loss claimed; and further, that the inventory must be supported by the insured's records. Unless such an inventory is furnished by plaintiffs, with such supporting records, defendants urge that insured cannot recover on the policy. The defendants thus seek to establish that the two provisions in question are practically tantamount to the old "iron-safe" clause.

A comparison of the "requirements in case of loss" clause with the "iron-safe" clause, however, brings out the striking dissimilarities between the two clauses. The requirements of the "iron-safe" clause were: (1) that the insured take "a complete itemized inventory of stock on hand at least once in each calendar year" or within thirty days of the issuance of the policy, or else the policy was voided; (2) that the insured keep a set of books, "which shall clearly and plainly present a complete record of business transacted, including all purchases, sales and shipments, both for cash and credit from the date of inventory;" (3) that the books and inventory be "securely locked in a fireproof safe at night, and at all times when the building * * *

is not actually open for business;" and (4) a failure to provide such set of books and inventory for the inspection of the insurer shall render the policy null and void and constitute a perpetual bar to recovery thereon.

On the other hand, the "requirements in case of loss" clause requires nothing to be done by the insured prior to the loss by fire. Then the insured must: (1) "furnish a complete inventory of the destroyed, damaged, and undamaged property;" (2) render within sixty days a sworn proof of loss; (3) produce for examination all books of account, bills, invoices, and other vouchers as often as may be reasonably required. As pointed out by the District Judge: "These are conditions subsequent to the loss, while the requirements of the old 'iron-safe clause' are conditions precedent." The "requirement in case of loss" clause is concerned primarily with the submission of an accurate proof of loss and with securing to the insurance company the right of access to the insured's records for the purpose of checking the items of the claim. It does not provide what records shall be maintained, how complete the records of the insured shall be, or where the records shall be physically kept. There is also no requirement that the proof of loss be established wholly from the written records of the insured. Finally, the "requirements in case of loss" clause has no provision for a forfeiture as does the "iron-safe" clause. These contrasting facts clearly show a clean-cut distinction between these two clauses. And it is well established that South Carolina requires only a substantial (as distinguished from a complete and literal) compliance with such clauses. McMillan & Son v. Insurance Co. of North America, 78 S.C. 433, 58 S.E. 1020, 1135; Cobb & Seal Shoe Store v. Aetna Ins. Co., 78 S.C. 388, 58 S.E. 1099; L. T. Madden & Co. v. Phoenix Assurance Co., 70 S.C. 295, 49 S.E. 855.

The defendants rely particularly upon Dickerson v. Franklin National Insurance Company of New York, 4 Cir., 130 F.2d 35, 38, but that case does not lend great weight to their position. There the "iron-safe" clause was involved, yet the only records

the insured was able to produce were two pages of a ledger containing entries as to certain lumber received and some sales invoices. No complete inventory had ever been made, and, as stated by the Court: "The inventory is the foundation of the bookkeeping required by the policy." See, also, Hartford Fire Ins. Co. v. Farris, 116 Va. 880, 83 S.E. 377.

In the case at bar, however, the plaintiffs did have a complete inventory, as of the first of the year, and, moreover, they filed monthly reports as to the value of the stock on hand in the destroyed warehouse. They also maintained an impressive set of books which admittedly were "in very good order." The defendants' chief criticism of the plaintiffs' records was that no receiving ledger was maintained for the Exchange Street Warehouse. There was testimony, though, to the effect that no waste warehouse kept such a ledger, and that the expense of keeping a running inventory would be prohibitive. Furthermore, the sales invoices and shipping books showed fully what had been shipped from the warehouse.

■ The plaintiffs have freely opened all of their records to the examination of defendants' adjusters and at all times have fully cooperated in efforts to determine the exact amount of the loss. The defendants do not challenge any particular entry of the proofs of loss as incorrect but merely content themselves with a broad assertion of the general inaccuracy of plaintiffs' records. In the case of Lumbermen's Mut. Ins. Co. v. Johnson Lumber Co., 5 Cir., 53 F.2d 940, it was held to be a jury question whether the records of the insured were sufficiently complete to show the true condition of his business at the time of the fire. See, also, Cobb & Seal Shoe Store v. Aetna Ins. Co., 78 S.C. 388, 58 S.E. 1099. The trial judge made a finding that the records kept by the plaintiffs constituted substantial compliance with the terms of the policy. We cannot say that this finding is clearly erroneous. Federal Rules of Civil Procedure, rule 52, 28 U.S.C.A. following section 723c.

We are also not impressed by the other contentions of defendants that regardless of compliance with the terms of the policy, the evidence was insufficient to support a judgment for plaintiffs, or, at least, a judgment for the full amount of the policy. Plaintiffs, in their proofs of loss, set their loss at 896,276 pounds of waste. Dodge estimated the loss at 909,205 pounds, and the Winn & Winn report test checked by the Dodge method places the destroyed poundage at a provisional figure of 915,000. When the fact is taken into consideration that more than 18,000,000 pounds of waste were bought and sold during the period involved, the small variation in the three results is all the more striking. There is unquestioned evidentiary force in the fact that these three totals do not vary greatly from the monthly reports rendered by plaintiffs as to the amount of wastage on hand in the Exchange Street Warehouse.

Dodge and the Winns were accredited certified public accountants. They devoted a great deal of time and effort to the ascertainment of the amount of the loss. When they could not use the normal procedure in such a situation, they each improvised another method. Thus, by independent paths, they arrived at results within in approximately 6,000 pounds of each other.

The defendants' accountant, Dawson, on the other hand, steadfastly refused to have any part in attempting to establish the amount of the loss. He restricted himself to a destructive criticism of the efforts of Dodge, the plaintiffs' auditor, and even refused to check Dodge's results, or to examine his work sheets. The same records, however, were as available to him as to the other two accountants, and actually the method insisted upon by him was the one employed by Winn & Winn.

The defendants bear hard upon the fact that Dodge received explanations and information concerning the stock card system and the shipments by truck from the oral statements of the partners. But, as was stated in McMillan v. Ins. Co. of North America, 78 S.C. 433, 58 S.E. 1020, 1023, 1135: "The fact that some parol testimony was necessary to make the showing by book entries complete is not a fatal objection, as under any ordinary system of bookkeeping some reliance must be placed upon parol

556

testimony in explanation to show stock on hand at any particular time, for in every case such factors as appreciation or depreciation of invoice price of stock, the rate of profit on cash and credit sales, the honesty and accuracy of the bookkeeper, must be taken into account." Furthermore, in preparing their reports, Winn & Winn did not communicate with the partners, nor did they even make use of plaintiffs' stock card system. Nevertheless, the results of the two accountants tend to corroborate each other.

We, therefore, are unable to say that the trial judge was clearly erroneous in his conclusion that "the records conclusively establish that there was an amount of waste destroyed in the Exchange Street Warehouse fire equal to, if not exceeding, that claimed in the proofs of loss."

The District Judge allowed a handling charge of fifty cents per hundredweight which was based upon undisputed testimony. But in the Court's order appointing Winn & Winn, the independent auditors, this charge was placed at fifty cents per bale. The defendants now contend that the pre-trial order was an adjudication of the amount of the handling charge. This order, however, was not an agreed or consent order. It was merely to serve as a tentative guide for the accounting firm and, therefore, was subject to revision by the introduction of uncontradicted testimony.

We, accordingly, affirm the judgment of the District Court.

Affirmed.