ARNOLD, Circuit Judge.
 

 This is an appeal from the judgment of the United States District Court for the Western District of Missouri
 
 [1]
 
 reversing a judgment of the United States Bankruptcy Court
 
 [2]
 
 entered in an adversary proceeding in bankruptcy. Agristor Credit Corporation brought suit in the Bankruptcy Court seeking additional amounts on its claim against the debtors, Loretta and Rolland Windle and R & L Farms, Inc., their corporation. The Bankruptcy Court tried the claim on the merits and entered judgment in favor of the Windles on their counterclaim
 
 *329
 
 against Agristor, thus in effect reducing Agristor’s claim against the bankrupt estate. On appeal the District Court reversed and rendered judgment for Agristor on the counterclaim. We affirm in part and reverse in part.
 

 Rolland and Loretta Windle, who were dairy farmers, began negotiating with Agristor Credit Corporation in early 1974 for a farm loan to refinance current loans and buy additional equipment. In order to comply with Agristor’s loan requirements (Missouri usury law does not limit the rate of interest to which a corporate debtor may agree), the Windles incorporated R & L Farms, Inc., and transferred their cattle and equipment to the corporation. They continued to own their farmland as husband and wife.
 

 On February 8, 1974, Agristor and the Windles entered into a loan commitment agreement for a $438,600.00 loan. The loan commitment agreement stated that all notes would mature annually and that the interest rate would be adjusted annually. On March 26, 1974, R & L Farms executed a promissory note to Agristor Credit Corporation in the amount of $438,600.00 (known as “the big note”). This note was secured by a deed of trust on part of the Windles’ farmland and a security agreement covering certain farm machinery, equipment, livestock, and crops of R & L Farms. Rolland and Loretta Windle also executed a guarantee of this promissory note as individuals. Agristor advanced $423,921.93 under this note. On April 1 and May 4, 1974, R & L Farms, through its officers, Rolland and Loretta Windle, executed two more promissory notes to Agristor in the amount of $27,400 and $40,000. In July of 1974, R & L Farms purchased a Harvestore and an un-loader from K. W. Harvestore by executing a promissory note for $38,565.26, which was assigned to Agristor Credit Corporation.
 

 Repayment of the $438,600.00 note was to be made from monthly milk proceeds at a rate of $10,725.00 per month. R & L Farms executed a milk-deduction request in favor of Agristor, authorizing Associated Milk Producers, Inc. (AMPI), to pay R & L’s monthly milk proceeds directly to Agristor after certain deductions. During the summer of 1974, milk prices fell drastically, and R & L was not able to continue meeting its current commitments. Agristor created a disbursement account through which milk payments were disbursed to pay current farm operating expenses. By early 1975 the Windles had decided to sell the dairy farm. They met with representatives of Agristor in May of 1975 to negotiate a liquidation or sale of the farm. The Win-dles had originally decided to sell the dairy farm as an operating unit. After discussions with Agristor, however, the parties agreed that Agristor would hold a liquidation sale of cattle and equipment later that year, when prices might be more favorable. Agristor agreed to allow the Windles to try to find a separate buyer for the farmland. At the time of these negotiations, in May 1975, the Windles were behind on their payments, and the notes had not been renewed by Agristor as provided for in the loan commitment agreement. Neither had Agri-stor adjusted the interest rate on the loan’s anniversary as provided in the agreement.
 

 On August 1, 1975, Agristor declared R & L Farms in default on the promissory notes of March 26, 1974, April 1, 1974, and May 7, 1974. R & L Farms and the Windles individually filed bankruptcy petitions later that month. The cattle and equipment sale, held on October 3 and 4, 1975, realized a net amount of $131,104.17. Agristor subsequently applied the net proceeds in the following manner:
 
 [3]
 

 
 *330
 
 Principal Interest Total
 

 April 1,1974 note $27,400.00 $ 5,997.73 $ 33,397.73
 

 May 7,1974 note 40,000.00 7,808.19 47,808.19
 

 March 26,1974 note 4,248,48 45,649.77 49,898.25
 

 TOTALS $71,648.48 $59,455.6 $131,104.17
 

 After the sale Agristor also received an additional $22,344.74 from AMPI in milk-deduction funds and $207.34 from the sale of a cow. These funds were used to pay expenses incurred prior to the foreclosure sale in connection with the care and preservation of the collateral. Agristor also continued to pay life-insurance premiums out of the milk money.
 

 The Windles present the following arguments for reversal:
 

 (1) That the District Court incorrectly determined that no oral agreement existed between the Windles and Agristor to apply the proceeds from the cattle and equipment sale to the March 26, 1974, big note.
 

 (2) That the District Court erred in concluding that the notes dated April 1, 1974, and May 7, 1974, were further advances under the loan commitment of February 8, 1974.
 

 (3) That the District Court incorrectly decided that interest should not have been denied on the March 26, 1974, note after March 25, 1975, because of an alleged inequitable course of conduct by Agristor.
 

 (4) That the District Court incorrectly determined that Agristor did not misapply AMPI proceeds by paying life-insurance premiums and other expenses after the cattle and equipment sale was conducted.
 

 (5) That the District Court erred in deciding that the Windles were liable for certain expenses incurred or paid by Agristor.
 

 After a careful review of the record in both the Bankruptcy and District Courts, we affirm on the basis of the District Court’s opinion on all issues, except the issue of the existence of the oral agreement.
 

 The District Court, rejecting a factual finding made by the Bankruptcy Court, found “no evidence” of the existence of the oral agreement between the parties. We disagree. There was conflicting oral testimony on the question of the existence or nonexistence of the oral contract. The resolution of conflicting testimony is usually the province of the finder of fact. In the present case, there was conflicting testimony which required the Bankruptcy Court to make a credibility determination. Both Mr. and Mrs. Windle testified that they did enter into an agreement with Agristor concerning the application of the sale proceeds to the big note. At the Bankruptcy Court hearing, Mr. Windle was asked on direct examination what understanding, if any, he had arrived at with Agristor in connection with the cattle sale. He replied:
 

 I would sell off the cattle and equipment in an orderly manner and place it on the note, $438,000.00. I would give no opposition, and it would give me time to sell the land personally at a nondistress situation.
 

 On cross-examination, he was asked:
 

 Q You have mentioned an agreement with Agristor which you say was one where they would sell the cattle and equipment and they wouldn’t oppose it, and you agreed to apply the proceeds to the big note?
 

 A That is correct, that is back probably in May, as I said before.
 

 Mrs. Windle testified similarly on direct examination:
 

 Q Did you agree with representatives of Agristor sometime in the spring of 1975 to sell off the livestock and the cattle, and have an agreement as to how the proceeds of that were to be applied?
 

 A Yes.
 

 Q Would you tell the Court how that was?
 

 A That it was to be applied, they were to be disbursed of, and it would be applied to the big note.
 

 Q Is that the one you and Rolland guaranteed?
 

 A Yes, sir.
 

 In contradiction to the Windles’ testimony, Mr. Ronald Utter testified as follows:
 

 Q Mr. Utter, in your absence Mr. and Mrs. Windle testified that in approxi
 
 *331
 
 mately May of 1975 they reached an oral agreement with Agristor Credit Corporation, by dealing with you, that there would be an orderly distribution of the cows and the milk equipment which they would not oppose, and you agreed to apply the proceeds of the sale of cows and equipment solely to the big note, is that correct?
 

 A No, sir.
 

 Q Did you ever have such an agreement with them?
 

 A No, sir.
 

 We do not think that the bankruptcy judge’s factual finding of the oral agreement should have been reversed as clearly erroneous, given the competent evidence in the record and the fact, which he emphasized in his opinion, that he found Mr. and Mrs. Windle more credible witnesses than those testifying for Agristor. See Bankr.R. 810, which is comparable to Fed.R.Civ.P. 52(a).
 

 In the case the District Court bore the same relationship to the Bankruptcy Court as we usually do to the District Courts — it sat as an appellate tribunal, not as a finder of fact. The deference owed by appellate courts to finders of fact is at its highest where the issue turns on the resolution of a direct conflict between live witnesses. Here, all the witnesses who testified on the subject had a strong personal interest. The Bankruptcy Court described their demeanor in detail, and explicitly stated its reasons for believing the Windles. In addition, it is of some interest that Richard Matthews, an employee of Agristor who took part in the negotiations with the Windles, was called as a witness by counsel for Agristor but was not asked whether the disputed oral agreement had been made. Agristor advances a number of reasons why such an agreement on its part was unlikely or implausible, but these arguments lie more within the competence of the trier of fact, than in the province of appellate judges, either district or circuit. On balance, we are not left with a definite and firm conviction that the Bankruptcy Court made a mistake. We therefore hold that the District Court should have affirmed the finding that Agristor orally agreed with the Windles to apply the proceeds of the sale of cattle and equipment exclusively to the balance due on the big note, which the Windles had personally guaranteed.
 

 The inquiry concerning the oral agreement does not end with the establishment of its existence. The mere fact that the parties had an agreement does not establish its legal sufficiency. Agristor has raised the issue of lack of consideration for its alleged promise to apply the sale proceeds to the big note. Its theory is that the Windles neither suffered a detriment nor conferred a benefit when they agreed to the sale in return for Agristor’s agreement to the application of the proceeds. They claim that under the terms of the security agreement the Windles were already under a legal duty to cooperate in the sale.
 

 Under the common law of Missouri, consideration sufficient to support a simple contract may consist either of a detriment to the promisee or a benefit to the promisor.
 
 Wells v. Hartford Accident and Indemnity Co.,
 
 459 S.W.2d 253 (Mo.1970). Generally, a promise to perform an existing obligation is not a valid consideration, unless the existence of the duty is the subject of an honest and reasonable dispute.
 
 General Insurance Co. of America v. Klein,
 
 517 S.W.2d 726 (Mo.App.1974). Agristor argues that under the terms of the security agreement covering the cattle and equipment the Windles had a preexisting duty to cooperate in the sale of the collateral once they were in default on the notes (though Agristor did not formally declare a default until August, 1975, about three months after the oral agreement). Agristor’s argument continues that since it had an absolute right to claim the collateral and sell it and the right under the security agreement to apply the proceeds in any way it wished, then any benefit it received from the agreement was purely illusory.
 

 The Windles contend that their agreement to cooperate with the sale was valid consideration for several reasons. First, the sale of the dairy farm as a unit would
 
 *332
 
 have been more advantageous to them, and they had located a potential buyer. The separate sale of collateral and land was better for Agristor, a fact admitted at the hearing. At the time of the May 1975 meeting, the Windles believed that Agristor was in default under the loan commitment agreement for the following reasons: failure to advance the full amount authorized,
 
 [4]
 
 failure to renew the loan, withholding of delivery of a Harvestore unloader purchased by the Windles, and failure to adjust the interest rate downward on the first anniversary of the loan.
 
 [5]
 
 In Missouri, the relinquishment or forbearance of a disputed or doubtful claim is sufficient consideration for a contract. “Where . .. the claimant has an honest and reasonable belief in the validity of an invalid claim, the relinquishment of such claim is sufficient consideration to support a promise.”
 
 Fox v. Burton,
 
 402 S.W.2d 329, 334 (Mo.1966). See also
 
 Duncan v. Black,
 
 324 S.W.2d 483, 486 (Mo.App.1959). Implicit in the Windles’ agreeing to cooperate with Agristor is their concession to forego any right they may have had to contest the liquidation on the basis of Agristor’s alleged defaults under the loan commitment agreement. We cannot say that the Windles’ belief that Agristor was in default under the commitment agreement was not an honest and reasonable belief. The fact that the Bankruptcy Court later decided some of these issues in their favor gives credence to the reasonableness of their belief that Agristor was in default and that agreeing to the sale was not merely the performance of an existing and uncontested legal obligation.
 
 [6]
 

 To summarize, we hold that the Bankruptcy Court did not clearly err in finding that an express oral agreement existed between the Windles and Agristor as to the application of the proceeds of the sale of the cattle and equipment; that both parties received some benefit from the bargain; and that the Windles’ forbearance to pursue the question of Agristor’s alleged defaults was sufficient consideration for the agreement.
 

 The judgment of the District Court is affirmed in part and reversed in part. The cause is remanded to the District Court, with directions to remand it to the Bankruptcy Court for a determination of the amount which the Windles should receive when the proceeds of the cattle and equipment sale are first applied to the March 26, 1974, note. The judgment of the District Court is affirmed in all other respects on the basis of its thorough opinion. See 8th Cir.R. 14.
 

 [1]
 

 . The Honorable Russell G. Clark, United States District Judge for the Western District of Missouri, now Chief Judge.
 

 [2]
 

 . The Honorable Frank P. Barker, Jr., Chief Bankruptcy Judge for the Western District of Missouri.
 

 [3]
 

 . The effect of this method of application was to pay off in full the smaller notes of April 1, 1974, and May 7, 1974. What was left was applied to the big note of March 26, 1974, which was secured by a deed of trust on the farm and the Windles’ guarantee. The parties stipulated that Agristor would have received $97,335.86 less than it did on April 6, 1977, from the subsequent sale of the Windles’ real estate if the proceeds of the cattle and equipment sale had been applied to the big note. Appellant’s brief states the figure a $99,335.86, p. 19, but this figure appears to be a typographical or clerical error.
 

 [4]
 

 . This point is hotly contested by Agristor, which claims that the April 1 note for $27,400 and the May 4 note for $40,000 were further advances under the loan commitment agreement. The issue for present purposes is not who is right, but whether the Windles had a reasonably litigable issue, the relinquishment of which is legally sufficient consideration.
 

 [5]
 

 . There was testimony in the Bankruptcy Court that the discount rate had fallen considerably by April of 1975. The loan commitment agreement stated that interest would be adjusted annually.
 

 [6]
 

 .In his preliminary order of August 10, 1978, Judge Barker found that Agristor had breached the loan commitment agreement by failing to adjust the interest rate on March 26, 1975. In his opinion of December 29, 1978, he also found that a breach occurred much earlier when Agristor failed to advance the full amount of the big note. On the basis of these breaches, he disallowed interest on the $438,-600 note after March 26, 1975. This holding was reversed by the District Court, and we affirm the District Court’s decision on that issue.