In the Matter of Clyde Lowell
**FARQUHAR, Debtor.**

**Stephen B. STRAYER, Plaintiff,**

**v.**

**James H. THOMPSON, Jr., Defendant.**

**Bankruptcy No. 87–02169–SJ–12–DJS.
Adv. No. 88–0575–SJ–12[1].**

United States Bankruptcy Court,
W.D. Missouri,
St. Joseph Division.

Aug. 2, 1988.

**1.** Although the within action was filed as a motion, it in substance is an action for the recovery of money within the meaning of Bankruptcy Rule 7001(1). It must therefore be filed as an adversary action and assigned an adversary number. The court's show cause order is sufficient process. See 2 Collier on Bankruptcy ¶ 24.39, p. 796 (14th ed. 1976), to the following effect: "[A]n order to show cause ... [is] in the nature of process."

Stephen B. Strayer, Liberty, Mo., for plaintiff.

James H. Thompson, Jr., Kansas City, Mo., for defendant.

Richard V. Fink, trustee, Kansas City, Mo.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT THAT PLAINTIFF HAVE AND RECOVER THE SUM OF $674.00 FROM DEFENDANT

DENNIS J. STEWART, Chief Judge.

The plaintiff, an attorney who succeeded the defendant as counsel for the debtor, brings this action to recover upon the defendant's alleged promise to pay plaintiff's attorney's fees. After issuance of appropriate mesne process by the court,[2] and the filing of a response thereto by the defendant, which joined the factual and legal issues to be resolved,[3] the action came on before the court for hearing of its merits on July 18, 1988, in St. Joseph, Missouri. The parties then appeared personally and as their own respective counsel. The evidence which was then adduced warrants the following findings of fact.

### Findings of Fact

When the debtor Clyde Lowell Farquhar filed the within chapter 12 proceedings on May 15, 1987, he had retained the defendant, James H. Thompson, Jr., as his counsel and paid him a retainer of $1,000.[4] Almost immediately after the filing of this

---

2. See note 1, supra.

3. In his response to the court's show cause order, Mr. Thompson pertinently stated as follows: (1) "the only agreement between movant and respondent was an oral agreement that respondent would pay over to movant the retainer he had received in this matter"; (2) "the Court has no jurisdiction in this matter is that this is not a core proceeding, nor does it concern property of the estate, and neither movant [n]or respondent are attorneys of record for the debtor ... [and] this dispute is a matter whose jurisdiction is based in state courts of the State of Missouri"; (3) "this matter should be an adversary matter and should be governed by VII of the Bankruptcy Rules of Procedure"; (4) "respondent is entitled to discovery in order to prove or disprove movant's allegations"; and (5) "assuming ... the validity of movant's allegation, the agreement would be unenforceable under applicable Missouri law in that it is violative of the Statute of Frauds for a promise to pay the debt of another must be in writing."

4. Mr. Thompson's disclosure statement which was filed with the court on May 15, 1987, pertinently stated as follows:

"The undersigned attorney states that the total compensation paid or promised him for services rendered or to be rendered in connection with the subject case as follows: The debtor(s) is the source of the compensation paid or promised to the undersigned attorney.

| | |
|---|---|
| Paid | $1,000.00 retainer |
| Additional Fee Promised | $.00 |
| TOTAL PAID AND PROMISED | $1,000.00 |

"I do hereby certify that I have not shared or agreed to share such compensation with any person other than a member or regular associate of my law firm."

case,[5] the defendant James H. Thompson, Jr., requested of plaintiff, Stephen B. Strayer, that Mr. Strayer succeed him as debtor's counsel in this case. According to the testimony of Mr. Strayer rendered in the hearing of July 18, 1988, Mr. Thompson induced him to take over this case as counsel by stating, "I'll pay your fees" and that Mr. Strayer would not have to take the risk of nonpayment by the debtor. Mr. Thompson, on the other hand, denies that he ever made any such promise to Mr. Strayer and states that he only agreed to turn over the $1,000 retainer to Mr. Strayer, which he did.[6] In his work consequently done in these chapter 12 proceedings, Mr. Strayer achieved confirmation of a chapter 12 plan. The debtor, however, himself filed a *pro se* objection to the plan of adjustment which was thus confirmed, stating his novel and erroneous conviction that some of the indebtedness which was treated as valid in the plan formulated by Mr. Strayer was in fact invalid because it was based on a judgment which had not been timely reviewed by means of a writ of *scire facias*.[7] Mr. Strayer. advised Mr. Farquhar that the judgment creditor had more than three years in which to seek such revival,[8] but this advice was of no avail to disabuse Mr. Farquhar of his preconceived notion in this regard.[9] Ultimately, Mr. Strayer was compelled to seek leave to withdraw as counsel for Mr. Farquhar, and leave was granted by the court.[10] At Mr. Farquhar's request, the order of this court confirming the chapter 12 plan which had been formulated by Mr. Strayer was set aside and, ultimately, the within chapter 12 proceedings were dismissed for failure of Mr. Farquhar to propose an intelligible plan of adjustment.[11] But, according to the orders which were

5. Mr. Strayer entered his appearance on August 5, 1987, 83 days after the date of filing, May 15, 1987, one (1) day after the court, on August 4, 1987, entered the following order:
   "For failure to pay the $200 deposit, the within case is hereby DISMISSED effective August 25, 1987, unless it is paid before then and the necessary insurance coverage is exhibited to the chapter 12 trustee."

6. See note 3, *supra.*

7. The debtor somehow believed that a judgment lien was terminated unless revived by means of a writ of *scire facias* within 3 years. The correct period, however, is 10 years rather than 3. See § 511.370 RSMo. to the following effect: "The plaintiff or his legal representative may, at any time within ten years, sue out a scire facias to revive and judgment and lien; but after the expiration of ten years from the rendition of the judgment, no scire facias shall issue."

8. See note 7, *supra.*

9. It was repeatedly stated by the debtor in his written communication to the court, that all the debts represented by unrevived judgments were "outlawed."

10. The order granting him to withdraw was entered on February 23, 1988.

11. See the order of March 9, 1988, to the following effect:
   "On February 23, 1988, this court issued its order directing the debtor to file an amended plan of adjustment on forms provided by the court and containing the information which is required by section 1222(a) of the Bankruptcy Code. On March 8, 1988, the court received a copy of papers from the debtor which stated certain reasons that certain claims should be 'outlawed' and a copy of the Missouri homestead exemption statute. But neither the court's forms were returned in a completed manner nor was any intelligible plan submitted to the court. Accordingly, for failure to file any confirmable plan within 90 days of the inception of this case, it is hereby
   "ORDERED that the within chapter 12 proceedings be, and they are hereby, dismissed in the absence of any written objection by any creditor filed with the court within 21 days of the date of filing of this order."
See also the order of May 2, 1988, to the following effect:
   "Formerly, on March 9, 1988, this court issued its order dismissing the within chapter 12 proceedings for failure of the debtor to file an amended plan on forms provided by the court and containing the information which is required by section 1222(a) of the Bankruptcy Code. The dismissal was conditional upon the 'absence of any written objection by any creditor filed with the court within 21 days of the date of filing of this order.' On March 28, 1988, the creditor Beulah Kelley filed a conclusionary objection to dismissal. No reasons were stated why the case should not be dismissed, nor was it offered to file an amended plan. The debtor also objected, but, again, did not offer to amend the plan so that it comported in form and substance with the governing statutes and the instructions of the court. It is therefore
   "ORDERED that the objections to dismissal be, and they are hereby, denied and that the dismissal is hereby made final."

made by this court during the course of these proceedings, Mr. Strayer rendered legal services having a reasonable value of $1,674.00.

Mr. Strayer, prior to instituting the action at bar, attempted to collect the $674.00 by which his charges exceeded the retainer from Mr. Thompson by sending Mr. Thompson a series of letters, nearly all of which adverted to Mr. Thompson's promise to pay Mr. Strayer's attorney fees.[12] To most of these letters, Mr. Thompson either did not respond or else otherwise did not deny the existence and tenor of an agreement as was being relied upon by Mr. Strayer.[13]

And, finally, it was at Mr. Thompson's insistence that Mr. Strayer filed an application for allowance by the court of $1,674.00 in attorney's fees. According to the credible evidence which was adduced in the hearing of this action, Mr. Thompson requested of Mr. Strayer that Mr. Strayer file an application for attorney's fees so that, if Mr. Thompson paid Mr. Strayer, Mr. Thompson would be in a position to collect the fees from the debtor.[14]

*Conclusions of Law*

Insofar as the merits of this action are concerned, they present the court with only

---

12. The letters were as follows:
   "August 11, 1987
   "I have run into a great deal of difficulty with both of these cases and can advise you that my fees are going to exceed retainers paid to you. Therefore, I would appreciate it if you would send me the retainers on both of these cases at this time.
   "I will keep you advised of developments. Thank you for your attention."
   "August 19, 1987
   "I have not received the retainers on the above cases as yet. I would appreciate it if you would send those right away.
   "Thank you for your attention."
   "September 21, 1987
   "You have ignored my letters and phone calls asking you to keep your promise to pay for my services in the above cases. I do not accept your excuse relayed through your brother. As far as I am concerned, I have taken two very large headaches off of your hands, and you have cheated me out of my time.
   "I have bills too, and I cannot spend my time as a rescue service for a lawyer who received payment from the clients and now refuses to pay me. The largest of my bills is $750.00 per month rent to your brother. If you won't pay me, perhaps you will pay your brother. Send your check for $1,500.00 to T.K. Thompson to pay for my rent for the months of October and November."
   "October 6, 1987
   "Thank you for the payment of $750.00 on the above cases. I will expect another payment of $750.00 from you no later than October 31, 1987.
   "As I stated in a previous letter to you, both of these cases present severe difficulties, and the fees for handling them properly will exceed the retainers paid you. Per your pledges, upon which I undertook these cases, you are to be responsible for all of my fees in these cases. I will be more than happy to accept payment from the clients for additional fees, if they will pay them. If not, I will expect you to cover the fees per your pledge to me.

   "Thank you for your attention."
   "November 10, 1987
   "Enclosed is my statement for services in the above case. I have applied the $750.00 that you paid to me in October to this debt. Therefore, you owe the balance which is set out on the statement.
   "I understand that you have been ordered to return the fees collected in the Kisser case. Per your call, I understand that you will be sending that retainer to the debtors in my care. I will arrange to have my fees on that case paid from that retainer.
   "Thanking you for your attention."
   "February 16, 1988
   "At your request I made an Application for Allowance of total fees in the above case in the amount of $1,674.00. The request was granted by the court subject to objection. Mr. Farquhar objected on the ground that he had paid you in full for the case per your agreement with him. It is apparent that he will not voluntarily pay the balance of the fees. In any event, I did not take this case on any promise from Mr. Farquhar, but rather your promise to pay my fees. Therefore, you owe a balance of $674.00 at this time, for which I request your prompt remittance.
   "Unfortunately, although I have obtained confirmation of the plan, there is more work to be done because of Mr. Farquhar's complaints concerning the scheduling of claims. The court has set a hearing on those complaints which will necessitate further time and fees on my part for which you will be responsible per our agreement."

13. Only in response to the letter of September 21, 1987, did Mr. Thompson state as follows:
   "I realize that I made a promise to you. I'll try to give you $750.00 a/month till the retainers are paid over to you."

14. Mr. Thompson's version of this conversation was slightly different from that of Mr. Strayer, but the court credits Mr. Strayer's testimony in this regard.

one palpable issue: whether Mr. Thompson made an enforceable promise to Mr. Strayer to pay the latter's attorney's fees. According to Mr. Strayer's testimony, such an agreement existed. According to Mr. Thompson's testimony, such an agreement did not exist. It is incumbent upon the trial court to make the determination as to which testimony is to be credited. And that determination is entitled to deference by the appellate court. See *In re Windle,* 653 F.2d 328, 331 (8th ·Cir.1981), to the following effect:

> "[T]he District court [bears] the same relationship to the Bankruptcy Court as [courts of appeal] usually do to the District Courts—it sits as an appellate tribunal, not as a finder of fact. The deference owed by appellate courts to finders of fact is at its highest where the issue turns on resolution [of the testimony of] live witnesses."

The trial court is entitled to rely upon the appearance and demeanor of the witness in making its credibility determination.[15] Accordingly, in observing the appearance and demeanor of the respective witnesses, this court declines to grant any credit on this critical issue to the testimony of the defendant, which was bellicose and threatening and freighted with total disrespect for all the participants in the hearing [16] and which in no way gave the impression that he in good faith was stating the truth.[17] Rather, this court credits the testimony of Mr. Strayer and finds that an enforceable promise to pay Mr. Strayer's attorney's fees was made by Mr. Thompson.[18] Therefore, judgment will be rendered for Mr. Strayer and against Mr. Thompson in the amount prayed.

■ This is so although Mr. Thompson may be considered to have raised the defense of statute of frauds, albeit obliquely and imperfectly.[19] The relevant provision of that defense is to the effect that, in order to be enforceable, a promise to answer for the default of another must be in writing.[20] But the evidence in this action does not show Mr. Thompson's promise to have taken the form of one to answer to the default of another. Rather, it was a direct and unconditional promise to Mr. Strayer to pay the latter's fees, not purporting to be in any way conditional on the debtor's failure to pay them.[21] Further, even if it could somehow be said that the

---

**15.** "It is not our task to re-try the facts of the case; this is especially true where the lower court's findings are based on oral testimony and the trial judge has viewed the demeanor and judged the credibility of the witnesses." *Franks v. National Dairy Products Corp.,* 414 F.2d 682, 685 (5th Cir.1969).

**16.** See *In re Windle,* 653 F.2d 328, 331 (8th Cir.1981), to the following effect:
> "The deference owed by appellate courts to finders of fact is at its highest where the issue turns on the resolution of a direct conflict between live witnesses. Here, all the witnesses who testified on the subject has a strong personal interest. The Bankruptcy Court described their demeanor in detail, and explicitly stated its reasons for believing the Windles."

**17.** Mr. Thompson's demeanor on the witness stand can be described as defensive and belligerent.

**18.** There can be no question that such a contract is supported by consideration in the form of Mr. Strayer's promise to succeed Mr. Thompson as counsel in this case.

**19.** See note 3, *supra.*

**20.** "No action shall be brought to charge ... any person upon any special promise to answer for the debt, default or miscarriage of another person ... unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized." Section 432.010 RSMo.

**21.** As noted in the initial findings of fact in the text of this memorandum, the promise was direct: "I'll pay your fees." "[T]he agreement or promise is an original undertaking, and thus not within the statute of frauds, '[i]f the credit is given by the promisee to the promisor alone' and 'the leading or main purpose of the promisor is to gain some advantage for himself, or to promote some interest or purpose of his own, rather than to become the mere guarantor or surety of another's debt, and the promise is made upon a consideration beneficial to the promisor.'" *E.F. Hutton & Co., Inc. v. Berns,* 682 F.2d 173, 178 (8th Cir.1982). In this case, according to the evidence, the promise was original and Mr. Thompson received consideration in the form of Mr. Strayer's promise to take over a case which Mr. Thompson believed himself to be incapable of handling.

oral promise was within the statute of frauds, the evidence before this court clearly shows that it was taken out of the statute by virtue of Mr. Strayer's full performance pursuant to and in reliance upon the promise.[22]

### The competency of the bankruptcy court to enter judgment

■ It is Mr. Thompson's contention that, even if Mr. Strayer is entitled to judgment against him, the bankruptcy court is powerless to enter it because the action cannot be characterized as a "core" proceeding within the meaning of § 157(b)(2), Title 28, United States Code. Rather, Mr. Thompson contends that the action is at most only "related" to the bankruptcy proceeding and that the bankruptcy court accordingly may only made recommended findings of fact and conclusions of law to the district. See § 157(b)(3), Title 28, United States Code. It is true that the suit at bar is one purporting to enforce a contract and that, as such, it appears at first glance to come within the prohibition of *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which constitutionally forbids bankruptcy court from determining ordinary contract actions.[23] The authorities which have been decided in the wake of the *Marathon*, decision, however, have restricted its pertinent ruling to apply to *prepetition* contracts made by or on behalf of a debtor and not *postpetition* contracts. See, *In re Epi–Scan, Inc.*, 71 B.R. 975, 979

(Bkrtcy.D.N.J.1987), to the following effect:

> "As applied to the facts of the present case, the Court finds that an action to recover on a postpetition account (as in the Dyson matter) is core for the reasons that such a cause of action clearly 'arises in' the title 11 case and was not owned by the debtor at the time the title 11 case was commenced. 1 *Collier* § 3.01(2)(b)(iii) (15th ed. 1986). Further, in exercising its discretion in this regard, the Court determines that the matter constitutes a core proceeding for the reasons set forth above, upon a concurrent finding that jurisdiction is predicated solely upon subsection (A) of 28 U.S.C. § 157(b)(2) to the exclusion of subsections (E) and (0), in that the matter arising postpetition is one directly affecting 'the administration of the case.' "

And, in the action at bar, the evidence clearly shows that the contract sued upon was made postpetition and directly "arises in" the course of administration of these chapter 12 proceedings. As a promise to pay debtor's attorney's fees it was tantamount to a promise to pay money directly into the estate.[24] And attorney's fees are ordinarily considered to be within the "core" jurisdiction of a bankruptcy court, for in regulating them, the bankruptcy court necessarily adds to or detracts from the magnitude of the bankruptcy estate. Indeed, the entire authority of a bankruptcy court to review transactions between debtors and their counsel is predicated

---

**22.** "It has been the settled law with us, from a very early period in the history of the state, that when such contract is fully executed by one of the parties thereto, when it has been fully and completely performed on one side, and the other party has had the benefit of such performance, it is thereby removed from the operation of the statute entirely, and recovery may be had on the contract in an action at law, as at common law prior to the adoption of the statute ... This doctrine applies alike to contracts falling within the operation of each and all the various section of the statute." *Burk v. Walton,* 337 Mo. 781, 86 S.W.2d 92, 94 (1935).

**23.** The suit which was held to be without bankruptcy court jurisdiction in the *Marathon* case was one "seeking damages for an alleged breach

of contract and warranty, as well as for misrepresentation, coercion and duress." *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 2860, 73 L.Ed.2d 598 (1982).

**24.** Thus, it is with some frequency said that the power of the bankruptcy court to examine fees of debtors' attorneys is based upon the power "to protect the creditors of the estate" and prevent its roundabout depletion by officers thereof. Advisory Committee Note to Bankruptcy Rule 2017. Thus, attorney's fees are considered as part of a bankruptcy estate, and actions which arise with respect thereto are considered to be actions "arising in" bankruptcy proceedings.

upon the principle that it should "prevent roundabout depletion of the estate." [25] And, if Mr. Thompson promised postpetition to pay Mr. Strayer's fees, then it was of basic importance to estate administration that they be promptly paid. Neither the Supreme Court, in rendering the *Marathon* decision, nor the Congress, in enacting § 157(b)(2), *supra*, can have intended that a decision so integral and basic to bankruptcy estate administration be referred to the district court on the basis of the bankruptcy court's recommended findings of fact and conclusions of law.

This principle seems especially applicable in the factual context of the action at bar, in which the decision must necessarily be made on the basis of a credibility determination. In such instances, this court has previously described, in *Matter of Richardson*, 85 B.R. 1008, 1022 (Bkrtcy.W.D.Mo. 1988), how the indescribable character of the credibility determination makes the report and recommendation process nearly useless in such cases. In that case, it was said:

"[T]his action appears to demonstrate the inefficacy of the bankruptcy court's making recommended findings of fact when the material issue to be determined is that of credibility. In those cases, use of the report-and-recommendation process, without the district court's conducting a new hearing on the issue, appears not only to offend the litigants' rights to an Article III trier of fact, but also to take little or no account of the ineffable character of a credibility determination. It appears that, in most imaginable instances, the district court would have to conduct a de novo hearing prior to making the determination and that, in those instances, the bankruptcy court's meantime offering recommended findings of fact and conclusions of law will have only resulted in delay in rendering the final decision and a duplication of effort between the bankruptcy court and district court."

Accordingly, the bankruptcy court should take it upon itself to issue the judgment in this action. If, on appeal, the district court determines that it was error for the bankruptcy court to have done so, the district court will have the option of treating the bankruptcy court's within findings of fact and conclusions of law as recommended findings of fact and conclusions of law. See *Smith v. United States*, 68 B.R. 105, 107, n. 3 (Bkrtcy.W.D.Mo.1986), to the following effect:

"Any question of whether the assignment of such power to the bankruptcy court converts it into an Article III court under the rule of *Glidden v. Zdanok*, 368 U.S. 814, 82 S.Ct. 56, 7 L.Ed.2d 22 (1962), can be obviated in this action by the district court's treating the decision of the bankruptcy court as recommended findings of fact and conclusions of law and making its own decision on the basis thereof. See *In re Waters*, 93 F.2d 196, 198 (5th Cir.1937), to the following effect:

'We think that the referee went too far in attempting to decree a cancellation of the mortgage summarily; but, since the evidence was all reported stenographically and went up to the judge along with the documentary proof and was fully considered by the judge, who made his own decree, the case has just had the treatment it would have had if a plenary bill had been filed, been reported on by a master, and then considered by the court. The referee made full findings of fact and conclusions of law, as a master would do, and the appellant elaborately excepted to them as if to a master's report. We will treat the case as a controversy arising in bankruptcy by intervention and decided by the judge, review of which on appeal as in equity opens up questions of law and fact.' "

■ Nor is the principle that the bankruptcy court has jurisdiction and power to enter judgment impeached by the fact that the within chapter 12 proceedings have now been dismissed. For the adjustment

---

**25.** See note 24, *supra*.

of attorney's fees is a matter forever within the subject matter jurisdiction of the bankruptcy court and a case may always be re-opened if necessary to create the power to make such adjustments.[26] As this court formerly stated in *Matter of Lowe.* In proceedings for reorganization under chapter 11 of the Bankruptcy Code, 97 B.R. 547 (Bkrtcy.W.D.Mo.1987), "even after an action has been dismissed, the court has jurisdiction to determine the disposition of funds held in custodia legis," quoting 20 Am.Jur.2d *Courts* § 147, n. 6, p. 495 (2d ed. 1965).

### Mr Thompson's notice of deposition

This court must finally observe that its order setting the hearing of the merits of this action for July 18, 1988, was entered on June 23, 1988. Shortly before July 18, 1988, Mr. Thompson, on June 30, 1988, issued a notice of deposition to Mr. Strayer which would have required Mr. Strayer to appear in Mr. Thompson's office for a deposition on July 15, 1988. Mr. Strayer promptly moved to quash the deposition by means of his motion filed on July 8, 1988. The court attempted to set a hearing on the motion to quash on July 12, 1988, but was not able to do so because Mr. Thompson was absent from his office on vacation. Ultimately, it was necessary to hold the hearing on the motion to quash on July 18, 1988, immediately prior to the hearing of the merits. In that hearing, it was plainly shown to the court that the notice of deposition fixed its date so belatedly and so close to the hearing of the merits that it could not have been sought to be conducted

for a legitimate discovery purpose.[27] Further, evidence was adduced through Mr. Thompson's own testimony to the effect that Mr. Thompson had announced to a small gathering of friends a few days before the serving of the notice of deposition, in vile and profane language, including vulgar and pejorative descriptions of Mr. Strayer, that he intended to make matters difficult for Mr. Strayer because of the filing of the claim for relief now at bar. This evidence, in addition to the belated service of the notice and the late setting of the deposition in relation to the trial date, led the court to issue its oral ruling on July 18, 1988, quashing the deposition. Mr. Thompson was, however, explicitly granted by the court the opportunity to request an adjourned evidentiary hearing in the event any evidence presented by Mr. Strayer surprised him so that he was unable to present contradicting evidence on July 18, 1988, Mr. Thompson did not, however, request any adjourned evidentiary hearing.

Accordingly, it is hereby

ADJUDGED that plaintiff have and recover the sum of $674.00 from the defendant.

---

**26.** "[A] case may be reopened for the purpose of examining transactions between a debtor and counsel." 8 Collier on Bankruptcy ¶ 2017.06, p. 2017–9 (15th ed. 1988).

**27.** "Defendants made no effort, either under the policy provisions, or the Rules of Civil Procedure, to examine the plaintiffs under oath, until two days before the trial before me without a jury, when defendants' counsel, on a motion for further pre-trial conference, said that they desired to examine the plaintiffs ... I saw no reason why the plaintiffs should be examined out of court on the single day intervening before they would be examined before me in open court." *Crowley v. North British Mercantile Ins. Co.,* 70 F.Supp. 547, 552, 553 (W.D.S.C.1947), affirmed, 164 F.2d 550 (4th Cir.1947). In the action at bar, in quashing the deposition, the court expressly granted Mr. Thompson the opportunity to have an adjourned hearing, on his request, if any of Mr. Strayer's testimony surprised him. Such an evidentiary hearing was not requested.