**In the matter of Rosabelle BORRON, Debtor.**

**CITIZENS BANK OF WINIGAN, Plaintiff,**

v.

**Rosabelle BORRON, Defendant.**

**Bankruptcy No. 78–60231–B–SJ.**

United States Bankruptcy Court, W.D. Missouri, St. Joseph Division.

March 24, 1983.

Patrick Richardson, Green City, Mo., for plaintiff.

Michael H. Berman, Kansas City, Mo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT DENYING THE DEFENDANT'S DISCHARGE IN BANKRUPTCY

DENNIS J. STEWART, Bankruptcy Judge.

This is an action in which the plaintiff bank has sought a denial of the defendant's discharge in bankruptcy, basically on two separate and independent grounds: (1) that of the making a false oath in the bankruptcy proceedings by failing to schedule a transfer of property which took place within the year next preceding bankruptcy as made a ground for denial of discharge by § 14c(1) of the Bankruptcy Act[1] and (2) that of failure sufficiently to account for the disposition of assets within the meaning of § 14c(7) of the Bankruptcy Act.[2]

After a full hearing on the allegations made by the plaintiff and answered by the defendant, the bankruptcy court issued its judgment on August 23, 1979, denying the discharge in bankruptcy on both grounds. In that judgment, the bankruptcy court (1) found that the transfer made within a few days of the date of bankruptcy did not, as contended by the defendant, simply memorialize a transfer made in advance of the year next preceding bankruptcy and was instead accomplished for the purpose of keeping the property transferred out of the bankruptcy estate[3] and (2) found that the

---

1. That section of the Bankruptcy Act provides as follows: "The court shall grant the discharge unless satisfied that the bankrupt has (1) committed an offense punishable by imprisonment as provided under Title 18, United States Code, Section 152 ..." The latter section includes the making of a false oath in bankruptcy. The specific allegations of the complaint at bar in this regard are as follows: "[B]ankrupt ... joined her husband, James E. Borron, in transferring two tracts of property subject to her marital interest to herself and her husband, James E. Borron, by warranty deeds as tenants by the entirety on August 26, 1978 ..." and did not schedule such transfer.

2. The applicable section of the Bankruptcy Act provides that "[t]he court shall grant the discharge unless satisfied that the bankrupt ... has failed to explain satisfactorily any losses of assets or deficiency of assets to meet his liabilities." In the complaint and the initial hearing of this matter that the bankrupt failed satisfactorily to explain the loss or diminution of assets listed by her in her financial statement rendered to the plaintiff bank on April 20, 1976. The assets listed in that financial statement included 150 head of cows with calves, 1800 breeder turkey hens, and 21,000 poults.

3. It appeared to this court, in rendering the judgment of August 23, 1979, that the bankrupt, in the August 26, 1978, deed, in transferring the property from herself and her husband to the same two persons "as tenants by the entirety," necessarily, according to the applicable rules of construction, rebutted any presumption that the property had previously been held in a tenancy by the entirety. Property "in the joint names of a husband and wife is presumed to be a tenancy by the entirety." *Matter of Anderson,* 12 B.R. 483, 487 (Bkrtcy.W.D. Mo.1981). But the presumption appears to be rebutted by the bankrupt's believing it was necessary to transfer the property into a tenancy by the entirety. And her interest in any other jointly held property, other than that held as entirety property, would be available to the trustee. Further, as a separate and independent reason for sustaining this ground of objection to discharge, this court disbelieved the bankrupt's testimony that the transfer into entirety property had been really made in the 1960's. When the trial court is in the unique position of observing the appearance and demeanor of the witnesses, its determination of credibility has ordinarily been honored by the appellate court. See *In re Windle,* 653 F.2d 328, 331 (8th Cir.1981). This is especially so in the context of an objection to discharge. "Because the Referee is in a superior position to make the proper determination of any issue of fact, it has been held that he has broad discretion in granting or refusing discharge." *In re Brown,* 314 F.Supp. 947, 954, 955 (W.D.Ark. 1970), affirmed, 444 F.2d 49 (8th Cir.1971).

The crucial fact of the matter is that, without the transfer of August 26, 1978, the property would clearly have been subject to the claim of the bankrupt's bankruptcy trustee and thus was property of the estate within the meaning of § 14c(4) of the Bankruptcy Act. The bankrupt and her husband admit a transfer from the name of James E. Borron to both their names some 10 or 15 years ago. Even though unrecorded, this transfer was effective, at least to give the bankrupt rights in the property. "In Missouri an unrecorded conveyance is void only as to any subsequent purchaser or mortgagee for valuable consideration and without 'actual notice;' it is valid as against subsequent judgment creditors, and a fortiori is good as against general creditor." Eckhardt and Peter-

bankrupt had failed to account, by means of evidence properly adduced, for the diminution of certain assets. In this regard, the bankruptcy court's findings were as follows:

"[T]he plaintiff contends that the bankrupt failed to explain satisfactorily, and to the degree of certainty required by the Bankruptcy Act, the loss or diminution of assets from the time of the financial statement of April 20, 1973, which she and her spouse filed with the plaintiff for the purpose of inducing it to extend credit to herself and her spouse. At the time of the filing of the financial statement, the bankrupt and her spouse represented that they had assets consisting of 150 head of cows with calves, 1800 breeder turkey hens, and 21,000 poults having a total value of $127,500.00. At the time of bankruptcy, they had considerably less property in each category. The bankrupt indicated that the aggregate value of all livestock was $40,000. Further, in the financial statement of April 20, 1976, the bankrupt and her spouse also claimed a considerable bank account and sums of cash on hand—some $15,000 in all—and some "150 shares stock," valued at $36,000. But, according to the petition and schedules in this case, none of these formerly ample repositories of wealth were yet in existence. Nor can it be said that jointly held properties in such categories should not have been scheduled by the bankrupt, if they in fact existed. See 4A Collier on Bankruptcy ¶ 70.18, p. 222, n. 43j (1978).

"By virtue of showing the foregoing, the plaintiff made a *prima facie* case of loss or diminution of assets and thereby shifted to the defendant the burden of explanation. 'It has been held that an objecting creditor makes out a *prima facie* case

under clause (7) . . . when the bankrupt listed assets in his bankruptcy schedules at a smaller figure than he had previously manifested himself to be worth . . . Once the plaintiff meets the initial burden of producing evidence to prove the facts to establish the objection, the burden of going forward with the evidence that will "explain satisfactorily" the losses or deficiencies shifts to the bankrupt.' 1A Collier on Bankruptcy ¶ 14.60, p. 1435, 1436 (1978). The defendant's explanation of the loss and diminution was but general: that some cattle had been sold and the proceeds applied against operating expenses; that some cattle had died during the winter of 1976–1977, that hens and poults were sold and the proceeds applied to the loan from the plaintiff and paid for operating expenses; that certain cattle were given to their children in the year 1977; and that some 5, 6, 7, or 8 horses have simply disappeared.

"The court finds such general explanations to be insufficient, particularly in view of the large amounts involved. 'An explanation which is based mostly upon an estimate of the bankrupt, founded upon nothing by way of verification or affirmation by means of books, records or otherwise has been held unsatisfactory.' 1A Collier on Bankruptcy ¶ 14.60, p. 1437 (1978). This is particularly true in respect of the cattle, which could have been expected to increase by some 300 calves between April 20, 1976, and the date of bankruptcy, over which period of time the bank received payment of the proceeds of only 130 calves. The general testimonial statements of the bankrupt are insufficient, without more, to account for such large losses of assets as have been evinced in all categories from the amounts held on April 20, 1976. Denial

son, Possessory Estates, Future Interests and Conveyances in Missouri, 23 Vernon's Annotated Missouri Statutes, p. 77. Although this deed transferred the property into the joint names of the bankrupt and her husband, the deed of August 26, 1978, characterizes the grantees as tenants by the entirety ("joint tenants with right of survivorship") but not the grantors. This constitutes an admission that, even if the

property was formerly jointly held, it was not in a tenancy by the entirety. Thus, the bankrupt's interest was claimable by the bankruptcy trustee. "Tenancies in common and classical joint tenancies may be severed by one of the parties by conveyance or suit for partition." *Johnson v. Woodard,* 356 S.W.2d 526, 528 (Mo. 1962).

of discharge in bankruptcy is also warranted for this additional reason."

■ The judgment thus rendered was appealed by the debtor to the district court, which issued its order of remand on November 28, 1980, observing that the initial transfer claimed to have been made of the property involved in the alleged fraudulent transfer occurred long before the year next preceding the date of bankruptcy and that, at the conclusion of the hearing, the bankruptcy court had announced its intention to review the files and records in the possession of the trustee in bankruptcy, to which counsel for the debtor had adverted in contending generally that those records contained evidence which might explain the diminution of assets.

4. The unfortunate remark of the court made at the conclusion of the former hearing expressed the court's intention simply to look at records which may have supported the estate's claim for the real property. See note 3, *supra*. It was, under the former Bankruptcy Act, the court's duty to do so and to prompt the trustee to initiate an action to recover, if appropriate. See *In re Dallas Cabana, Inc.*, 441 F.2d 865, 868 (5th Cir.1971). But it was neither the duty of the court nor within its proper powers to make the case for the bankrupt without according due process to the plaintiff.

5. The bankruptcy court, pursuant to the district court's order of remand, entered its initial orders setting the hearing of the issues defined by the order of remand for August 7, 1981. In anticipation of the hearing, the bankruptcy court further entered its order on July 9, 1981, directing the bankrupt to "describe in writing to the court within 10 days of the date of entry of this order any books, records, or documents previously turned over by her to the former trustee in bankruptcy but which are not presently available to her." There was no response to that order. The parties, however, agreed to a continuance, with the result that the court entered its order on July 23, 1981, continuing the hearing from August 7, 1981, to October 2, 1981. At that time, the defendant only handed over to the court, *in toto*, the records and documents which had previously been handed over by her to the trustee in bankruptcy. Consequently, this court entered its order on October 21, 1981, directing that:

"Rosabelle Borron within 20 days of the date of entry of this order designate in writing *which* records explain the diminution of assets. In addition, the defendant should explain *how* those records account for the diminution of assets."

This court, however, had not reviewed the files and records in the possession of the trustee and, when the debtor had been granted a full and complete evidentiary opportunity to explain the diminution of assets, it would have been wholly improper for the court to have done so.[4]

Nevertheless, pursuant to the order of remand, the court has granted the bankrupt successive opportunities to exhibit to the court the files and records possessed by the trustee which allegedly sufficiently explain the diminution of assets. After the granting of repeated opportunities to present these documents and to explain how they sufficiently account for the diminution of assets,[5] the court has been presented with

On November 12, 1981, counsel for the bankrupt requested an extension of time in which to comply with that order, stating that:

"Mr. and Mrs. Borron currently live in Kirksville, Missouri and it will be necessary for them to make a trip to Kansas City in order to examine the records currently in possession of this Court and to thereby comply with this Court's order of October 21, 1981."

Accordingly, on November 30, 1981, the bankruptcy court granted an additional 15 days in which to respond to the order of October 21, 1981. On December 14, 1981, pursuant to the order of October 21, 1981, the bankrupt filed a "designation of records explaining diminution of assets." The "designation" thus filed consisted of a summary of the existing records which, in turn, may be summarized as follows, as relevant to this action:

(1) *With respect to 150 head cows with calves valued at $76,100.00.* The bankrupt has summarized the available records as follows: "The records before the Court (the Disbursements Journal and the Check Registers) show that the 1976 calf crop was sold for $25,652.22. The proceeds of the sale of the 133 calves were used as in prior years to pay farm and general living expenses. Russell Crist, the former President and Chairman of the Board of the Citizens Bank of Winigan (Transcript of Hearing of March 29, 1979, p. 36), has previously testified that the calf crop was sold annually and the proceeds used by the defendant. (Tr. 49–52) The 1977 calf crop, consisting of 132 animals, was sold through the Green City Auction Company for $20,206.62. Pursuant to the Order of this Court dated November 8, 1978, the proceeds were paid directly from the Green City Auction Company to Citizens Bank of Winigan. Consequently, the disposition is reflected by

an undifferentiated mass of documents. These documents generally do not pertain to the same categories of assets which the

> the order of this Court and not by the records of this debtor now in the possession of the Court. The rest of the livestock of this debtor referred to in the financial statement was either taken and sold by the bank pursuant to the October 13, 1978, Order of this Court or were lost as a result of the harsh weather. (Tr. 107–108)."
>
> (2) *As to the 1800 Breeder turkey hens and 21,000 poults.* The bankrupt does not contend that there are any books or records in those which had been given over to the trustee which would account for the disposition of these animals. Rather, it is stated that "(a)ll of these animals were delivered to the Borron Turkey Processors. (Tr. 104, 106) Over the years the proceeds were received as the turkeys were sold by the processing plant, and were used as set forth in the Disbursements Journal and the check registers. The final sum to be realized by the debtor in the amount of $9,152.21 was paid to the Citizens Bank of Winigan by the Trustee in Bankruptcy pursuant to this Court's Order of April 3, 1979."

The statements of the bankrupt in the schedules attached to her bankruptcy petition, however, show that the property in the above categories—valued at $127,500.00 as of the time of the rendition of the financial statement in April 1976, had declined to $40,000.00 at the time of the filing of the petition in bankruptcy on September 11, 1978. The records and the foregoing summary wholly fail to account for the disposition of the 150 cows, although the calves may be reasonably accounted for. Nor do they account for the 1800 breeder turkey hens and 21,000 poults, when the records, without summarization, do not show which, if any, of the income came from the sale of the poultry. The property which was turned over to creditors pursuant to court orders after the date of bankruptcy is not relevant, since, according to the evidence before the court, by the bankrupt's own admission, only $40,000.00 worth of this property was in existence as of the date of bankruptcy.

Accordingly, the court entered its order on May 12, 1982, noting that, "(a)lthough the Disbursements Journal and Check Registers depict how money was spent, they do not specify where the money came from for such payments . . . it is not possible to distinguish what monies were used for the disbursements recorded." In the order of May 12, 1982, the court concluded that:

> "Under the provisions of Rule 1006 of the Federal Rules of Evidence, a summary must be made intelligible. It is unsatisfactory for the defendant now to attempt to compel the court to do her accounting by simply submitting to it a mass of documents without any

bankruptcy court has previously found not to be accounted for.[6] Even if it can be said that the missing assets are subsumed into

> reference to the assets which have been described on page 9 of the court's judgment of August 23, 1979, as having been diminished without sufficient explanation. The defendant must now, without further substantial delay, submit a written summary to the court which, if appropriately supported by documents, would clearly show the disposition of the assets summarized on page 9 of the court's judgment of April 23, 1979."

The defendant was therefore requested to supply a summary within 12 days. A motion for an additional thirty days was then filed by the defendant. But no summary has ever been provided.

The court has since again reviewed the records on file and can find no way of interpreting the documents to account for the diminution of assets described above from $127,400.00 to $40,000.00 as of the date of bankruptcy. "(W)here the records fail to explain business transactions whereby a large shrinkage of assets result, a discharge should be refused upon the ground of failure to keep proper books or records." 1A Collier on Bankruptcy ¶ 14.32, p. 1368 (1976).

6. The categories of diminished assets, as noted in the text of this memorandum, which provided the basis for the court's former judgment of August 23, 1979, were the 150 head of cows with calves, 1800 breeder turkey hens, and 21,000 poults having a total value of $127,500.00. The court, in view of the recurring refusal of the bankrupt to summarize the documents, has, pursuant to the instructions issued by the district court in the order of remand, painstakingly taken a great deal of time to cull through the documents and to reexamine them several times in attempting to find an explanation for the loss or diminution of these assets. But there are no specific references in any of the documents to the existence of these animals as of April 20, 1976, nor any records which show the disposition of those animals subsequent to the date. Counsel for the bankrupt has also made the conclusionary contention that the disposition of this property is reflected in the courts other orders in this bankruptcy proceeding. Again, the bankrupt has failed and refused to specify the portions of the orders or findings which so demonstrate, and accordingly the court has had to comb through these orders and the notes of the evidence underlying them to find some explanation of the loss and diminution of these assets. But no mention therein exists of assets of the kinds abovementioned in anything approaching the magnitude abovementioned. Further, this consideration is irrelevant when it is the *prebankruptcy* diminution of assets which in issue rather than the *postbankruptcy* diminution of assets. See note 5, *supra.*

one or more of the categories which appear on the records presented to the court, the records do not account for the diminution of assets in the magnitude which a comparison of the bankrupt's financial statement and schedules shows.[7]

In this regard, it must be mentioned that it is also a prerequisite to the granting of a discharge in bankruptcy that a bankrupt keep and preserve such books and records as will enable the court to ascertain his financial history and status [8] and that *those records must be intelligible.*[9] A bankruptcy court is not required to sift through voluminous documents and create intelligibility where it does not exist.

Counsel for the bankrupt also contends that the diminution of these assets is satisfactorily explained by the findings contained in other judgments rendered by this court in this same bankruptcy case. Again, however, a review of those findings does not account for a loss of assets in the magnitude shown by a comparison of the financial statement and schedules.[10]

For the foregoing reasons, the court must conclude that the above described diminution of assets is insufficiently explained and, accordingly, that the discharge in bankruptcy should be denied.

## II

The district court, in remanding this action to the bankruptcy court, has seemingly made it clear that its conclusions respecting the transfer as a ground for denying discharge were only tentative.[11] In this regard, therefore, this transfer continues to exist as an alternative basis for denying the bankrupt's discharge in bankruptcy. The district court has opined that the transfer may have taken place prior to the year next preceding bankruptcy, thus taking it out of the time limitation of § 14c(4) of the Bankruptcy Act. This court, however, had found that the transfer into a tenancy by the entirety was made only as of the time when it was recorded, only days prior to the filing of the petition for voluntary bankruptcy. It disbelieved the undocumented testimony of the bankrupt and her husband to the effect that they had actually made the transfer earlier. Such credibility determinations are within the province of the trial court and, particularly in the context of

---

7. The court's review of the files and records which had, prior to the remand, been in the hands of the trustee, does not reveal any category which may reasonably be considered as an accounting for the loss of the assets described in the text of this order. And the bankrupt has been granted ample and repeated opportunities to point out the existence of such categories in the documents.

8. "The court shall grant the discharge unless satisfied that the bankrupt has ... destroyed, mutilated, falsified, concealed, or failed to keep or preserve books of account or records, from which his financial condition and business transactions might be ascertained, unless the court deems such acts or failure to have been justified under all the circumstances of the case." Section 14c(2) of the Bankruptcy Act.

9. "(T)here was no abuse of discretion by the referee where he denied a discharge when 'neither the bankrupt nor his accountant could untangle or supplement the morass of disjointed and incomplete records and memoranda which the bankrupt brought into court.'... Thus, where the records fail to explain business transactions whereby a large shrinkage of assets result, a discharge should be refused upon the ground of failure to keep proper books or

records." 1A Collier on Bankruptcy ¶ 14.32, pp. 1363, 1368 (1978).

10. See note 5, *supra.*

11. In its order of remand of September 8, 1980, the district court speculates that, if no transfer took place previously (10 or 15 years prior to 1978, as the bankrupt and her husband contend), then the bankrupt had nothing to convey by means of the deed of August 26, 1978. But this is not so when the property has been gained by her husband during his marriage to her and she therefore had marital rights in the property which might have been claimed by the trustee in bankruptcy. See note 6, *supra.* Further, it was not the fact of a transfer in the 1960's which this court initially and still disbelieves, but a transfer into a tenancy by the entirety. Otherwise, the bankrupt would not have felt it necessary to make such a transfer 15 days before the date of bankruptcy of property which would otherwise have been available to the estate. See note 3, *supra.* And the district court noted in its matter of remand that this "matter can be considered further, on remand, if necessary to decision."

denial of discharge, those credibility determinations are ordinarily granted great deference by the appellate court. "Because the Referee is in a superior position to make the proper determination of any issue of fact, it has been held that he has broad discretion in granting or refusing discharge." *In re Brown,* 314 F.Supp. 947, 954, 955 (W.D.Ark.1970), affirmed, 444 F.2d 49 (8th Cir.1971). The rule is particularly applicable in a case such as that at bar, in which the issue of credibility of the parties is involved. See also, *In re Windle,* 653 F.2d 328, 331 (8th Cir.1981), to the following effect:

> "In this case the District Court bore the same relationship to the Bankruptcy Court as we usually do to the District Courts—it sat as an appellate tribunal, not as a finder of fact. The deference owed by appellate courts to finders of fact is at its highest where the issue turns on the resolution of a direct conflict between live witnesses."

In this case, the findings of the bankruptcy court on the issue of credibility are supported not only by this court's view of the appearance and demeanor of the witnesses, but also by their own self-contradiction in making their transfer of record only days before the date of bankruptcy. This intention can also clearly be seen from the fact that they did not report the transfer in their schedules. This court must therefore, in exercising its duty under the governing substantive and procedural law, find that an alternative ground for denial of discharge exists in this proscribed transfer.

It is commonly said that even when grounds for the denial of discharge exist, it is still within the discretion of the bankruptcy court as to whether discharge should actually be denied.[12] In this case, it must be noted that the transfer made only days before bankruptcy deprived the bankruptcy estate, and therefore the general creditors, of the value of the property transferred; that, in a prior decision, the district court

has termed bankruptcy cases in which one of the spouses only takes bankruptcy, thus discharging joint debts but simultaneously depriving the estate of entirety property as "legal fraud". (See *In re Magee,* 415 F. Supp. 521, 527, 528 (W.D.Mo.1976), to the following effect: "The question presented is whether, without giving these creditors an opportunity to proceed, the court should grant the discharge knowing that it will result in legal fraud i.e. the effective withholding of the property from the reach of those entitled to subject it to their claims, for the beneficial ownership and possession of those who created the claims against it"); and that it is far too great an abuse of the Bankruptcy Act to add the unlawful fraud of a prohibited transfer to the "legal fraud" which otherwise exists. It is cases such as that at bar, in which bankrupts are allowed to subvert justice by manufacturing a fanciful and undocumented claim that an unlawful transfer really took place years ago which create a dubious reputation for the American system of bankruptcy laws. If, *as a matter of appellate review* (that is, as a matter of law), the bankruptcy court's findings on this issue can be overturned, it will be a signal to would-be bankrupts that they may freely and with impunity undertake prohibited transfers just before bankruptcy so long as they advance a claim—the credibility of which the bankruptcy court will not be permitted to assess—that the transfer only effects what was privately intended by them to happen years before.

It is therefore, for the foregoing reasons,

ADJUDGED that the bankrupt's discharge in bankruptcy be, and it is hereby, denied.

---

12. "Trial courts have wide discretion in determining whether books or records are adequate under the terms of the statute and the facts of each case. This determination should not be disturbed unless there has been a clear abuse of discretion." *Goff v. The Russell Company,* 495 F.2d 199, 202 (5th Cir.1974).