In the Matter of Herman Duane CAR-ROLL, and Joann Carroll, Debtors.

**CHILLICOTHE STATE BANK, and Thomas L. Williams, trustee in Bankruptcy, Plaintiff,**

v.

**Herman Duane CARROLL, and Joann Carroll, Defendants.**

Bankruptcy No. 85–03539–SW.
Adv. A. Nos. 86–0059–SW, 86–0083–SW.

United States Bankruptcy Court,
W.D. Missouri,
Southwestern Division.

July 15, 1986.

Thomas L. Williams, Roberts, Fleischaker & Scott, Robert L. Bradley, Blanchard, Van Fleet, Martin, Robertson & Dermott, Joplin, Mo., for plaintiff.

J. Kevin Checkett, Esterly, Spradling & Checkett, Carthage, Mo., for defendants.

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENTS SUSTAINING COMPLAINT FOR DENIAL OF DISCHARGE AND DENYING COMPLAINT FOR A DECREE OF NONDISCHARGEABILITY**

DENNIS J. STEWART, Chief Judge.

The above styled actions, consisting of an objection to discharge upon the principal ground of debtors' failure to disclose in the schedules the granting of an additional mortgage on their residential real property a scant four days before the composition of the petition for voluntary bankruptcy and a complaint for a decree of nondischargeability on the ground of a false financial statement, have been consolidated for the purposes of hearing and determination.[1] Hearings on the merits of the actions have been conducted by the court in Joplin, Missouri, on the dates of June 5, 1986, and June 23, 1986. In respect of the grounds underlying the objection to discharge, the evidence which has been adduced to the

---

1. The order of consolidation was made by the court orally during the initial hearing of these actions. It is now memorialized in writing in the text of this order.

court establishes the following relevant and material facts. On July 31, 1985, the debtors granted an additional mortgage on their property to the creditors G.B. Gilbert and Virginia M. Gilbert. This was necessarily done with knowledge of the impending bankruptcy and for the purpose of hindering and delaying the other creditors and preferring the creditors who were the recipients of the transfer. This is evidenced by the fact that, although the bankruptcy petition was not filed until October 3, 1985, the debtors actually filled out their bankruptcy schedules in their former attorney's office on August 3, 1985.[2] Further, the transfer was apparently accomplished for the purpose of ensuring that any possible equity in the residential property was encumbered so as to keep that possible equity away from the general creditors and their representative, the trustee in bankruptcy. For Mr. Carroll, in his testimony before the court in the hearing of June 23, 1986, testified that the purpose of the transfer was to ensure that the debtors would retain, despite the bankruptcy proceeding, full possession and control of the property on which the additional mortgage was granted.[3] This finding is warranted by the overwhelming evidence, despite the fact that the defendants sponsored evidence to the effect that the indebtedness to the first mortgagee, at the time of the transfer, was approximately $79,000[4] and the value of the property was in the range of $75,000 to 83,000.[5] Neither the court nor the creditors nor the trustee in bankruptcy is bound by such evidence of value. The pertinent case authority holds that such a transfer may be regarded as fraudulent within the meaning of § 727(a)(2) of the Bankruptcy Code even though the debtor contends that it was his belief that the transferred property had no value.[6] In this case, the debtors' own admission that the transfer was accomplished for the purpose of ensuring their control over the property warrants an inference that there was value in the property which they wished to keep away from the trustee in bankruptcy. And the same admission, under the circumstances of the case, tends also to establish the intentional and fraudulent character of the transaction.

To weaken the strong platform of such inferences, the debtors made a testimonial contention, by means of the testimony of Mrs. Carroll in the initial hearing, that they had made an attempt to amend their schedules and statements of affairs so as to include mention of the prebankruptcy transfer to the junior mortgagee. According to Mrs. Carroll's testimony, this was done after the petition in bankruptcy was actually filed and their former attorney received notice from the court that it would be necessary to supplement the initial filing by filing an additional statement of affairs.[7] She and her husband claim that they then made out statements of affairs which documented the transfer and forwarded them to their then attorney for

2. The testimony of the debtor Joann Carroll in the hearing of June 23, 1986, in Joplin, Missouri, seemed to be to the effect that the initial schedules and statements of affairs had actually been filled out by the debtors a day or two *before* the transfer. But they almost certainly intended to make the transfer at the time they filled out the schedules, if this is so. And further, they met with their attorney on August 3, 1985, to approve the schedules and they did not then seek to correct or supplement them in this regard. It cannot be said under the circumstances that the debtors have no responsibility for the contents of papers which they signed and caused to be filed with the court.

3. "We wanted to make sure we had a place to live," according to Mr. Carroll's testimony.

4. The defendants' evidence to this effect is uncontradicted. The plaintiff presented no evidence on the issue.

5. No evidence of value was presented by the plaintiff.

6. See *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984) ("The recalcitrant debtor may not escape a ... denial of discharge by asserting that the admittedly omitted ... information concerned a worthless ... holding; such a defense is specious.")

7. According to the documentary evidence submitted to the court in the hearing of June 23, 1986, the notice of the court to file a statement of affairs for debtors engaged in business was distributed on October 3, 1985.

filing with the court. But, in his testimony given before the court on June 23, 1986, the attorney denied receipt of any such statement of affairs and no such statement of affairs was ever filed with the court.[8] It must also be observed that the debtors' contention to this effect was one which was belatedly raised in these proceedings, mentioned for the first time in the course of the initial hearing of this adversary action and not previously in the pleadings or otherwise. Thus, even when it was initially called to their attention that the deficiency at issue existed, they neither made haste to correct it nor to draw attention to their potential allegation of a prior attempt to correct it. Their inexplicable delay must necessarily affect the court's determination of the credibility of the contention, and must affect it adversely.

These facts clearly demonstrate the existence of grounds for denial of discharge, the making of a false oath in connection with the bankruptcy proceedings as well as a prohibited prepetition transfer with actual intent to hinder, delay, and defraud creditors.[9] It remains discretionary with a bankruptcy court whether to grant or deny discharge.[10] And it is always a most unpleasant obligation of a bankruptcy court to have to enter the harsh and relentless decree denying a discharge in bankruptcy. As this court has observed on prior occasion, such a decree has the effect of placing individuals at the mercy of their creditors and in many—if not all—respects may make life virtually impossible.[11] The Bankruptcy Code was certainly intended in appropriate circumstances to prevent such a result and to promote and facilitate the recovery of economically distressed persons wherever and whenever it is consistent with issues of honesty to do so. In this respect, this court has pointed out in a recent decision how fundamental and vital the bankruptcy power is to the preservation of the concept and practice of individual freedom which, in turn, provides the predicate for our national strength and well-being. See *Matter of Burstein-Applebee Co.*, 63 B.R. 1011, 1019 (Bkrtcy.W.D. Mo.1986), in which it was said that:

> "For it is clear that if a citizen has the right to only one economic chance—if one significant economic failure means that he must spend the remainder of his existence in servitude, despite the fact that his industry and creativity might otherwise have bestowed benefits upon himself and society—then the predicate upon which our democratic institutions exist would stand in grave peril."

It is plain and evident from an examination of these fundamental concepts that, in determining the issue of who is entitled to a discharge in bankruptcy, the bankruptcy courts must make one of the most important, critical and sensitive decisions known to American jurisprudence. Fine distinctions must be painstakingly and accurately—yet promptly—perceived. For it is clear that tempering justice with mercy in granting discharges under some circumstances will promote the ideals of giving struggling debtors new economic life; in others—not far removed factually, perhaps, from these situations—it can only stultify and defeat that ideal by leaving it open for those who would practice artifice and deception to abuse the bankruptcy sys-

---

8. The attorney further stated that if the alleged amended statement had been received by his law firm, it would have been sent to him.

9. See §§ 727(a)(2) and (a)(4) of the Bankruptcy Code.

10. See, e.g., *Matter of Laughlin*, 7 B.R. 924, 926, n. 13 (Bkrtcy.W.D.Mo.1981); *Matter of Borron*, 29 B.R. 122, 128, n. 12 (Bkrtcy.W.D.Mo.1983).

11. See, e.g., *Matter of Karl Kenneth Jones* and *Bonnie Maxine Jones*, 67 B.R. 484, 487 (Bkrtcy. W.D.Mo.1985), to the following effect: "The debtors had the intent to hinder, delay, and defraud creditors when they made the transfer of March 28, 1984. The coincidence of many badges of fraud is too great to make any other finding in that respect. But the great indebtedness owed by the debtors would make life nearly impossible for them if the discharge were not granted. The loss of the property itself may be a sufficient penalty under these circumstances and there are some mitigating circumstances in the debtors' appearing to believe that they were bound by the wishes of the mother of Karl Kenneth Jones in the matter."

tem. And experience teaches that when the permutations of the law promote abuse, the bankruptcy system tends to become a haven for the abusers, for others who might otherwise, in their hour of need, avail themselves of the process refrain from doing so out of shame and fear for their reputations. On the great continuum of considerations created by these principles, this court believes it to be of crucial importance that, in all past cases in which it has elected to exercise its discretion to grant discharge when a ground for denial of discharge has been shown to exist, those grounds did not involve any fraud directly in the bankruptcy proceedings themselves.[12] In the case at bar, however, the defendants are shown knowingly to have failed to disclose the prohibited transfer to the court. To suffer such an intentional abuse of its own processes without denying discharge would be a signal to all that the court will easily tolerate those abuses. The preservation of the bankruptcy process for the demonstrably honest and struggling debtors is too vital and necessary to permit the court to indulge itself in such unwarranted leniency. Under the circumstances, there is no alternative available but to deny the debtors' discharges in bankruptcy.

There is no need, accordingly, to treat of the complaint requesting a nondischargeability decree. See 1A Collier on Bankruptcy ¶ 17.28A, p. 1742.3 (14th Ed. 1976), to the following effect: · "[I]f complaints objecting to the bankrupt's discharge have been filed, then trial of dischargeability of particular debts should be postponed until the question of the bankrupt's general discharge is determined, for if discharge is denied, all dischargeability proceedings become moot."

Accordingly, it is hereby,

ORDERED, ADJUDGED AND DECREED that the defendants' discharges in bankruptcy be, and they are hereby, denied.

12. See note 11, *supra.* In that case only a pre-bankruptcy fraudulent transfer was involved

which, moreover, was recovered by the trustee.