In the Matter of Lindley Jennings Foraker HACKER, Jr., and Sharon Sue Hacker, Debtors.

MIAMI NATIONAL BANK OF MIAMI, OKLAHOMA; United Bank of Steamboat Springs, Colorado; and First State Bank of Joplin, Missouri, Plaintiffs,

v.

Lindley Jennings Foraker HACKER, Jr., and Sharon Sue Hacker, Defendants.

Bankruptcy No. 85–04335–SW.
Adv. Nos. 86–0124–SW, 86–0317–SW and 86–0201–SW.

United States Bankruptcy Court, W.D. Missouri, Southwestern Division.

Dec. 28, 1987.

Norman E. Rouse, Collins, Webster and Rouse, Joplin, Mo., for Miami Nat. Bank of Miami, Okl.

David L. Taylor, Myers, Taylor and Whitworth, P.C., Webb City, Mo., for defendants.

R. Deryl Edwards, Joplin, Mo., for United Bank of Steamboat Springs, Colo.

Robert L. Bradley, Blanchard, Van Fleet, Martin, Robertson & Dermott, Joplin, Mo., for First State Bank of Joplin, Mo.

## MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING FINAL JUDGMENT DENYING THE DEFENDANTS' DISCHARGES IN BANKRUPTCY

DENNIS J. STEWART, Chief Judge.

The plaintiffs request that the discharges in bankruptcy of the debtors be denied for failure satisfactorily to explain the diminution of assets to meet liabilities. See Section 727(a)(5) of the Bankruptcy Code.[1] The defendants satisfactorily explained the diminution of assets which was initially brought into focus by the respective complaints. In doing so, however, the defendant Gary Hacker mentioned in his testimony that he had taken in some $1.2 million in revenues during the expanse of time which immediately foreran the current chapter 7 proceedings.[2] Because any mo-

nies thus taken in, unless otherwise legitimately expended, should have been available to pay scheduled creditors,[3] the statement made it incumbent upon the defendants to explain the disposition of those assets. Subsequently, because of the voluminous documentation which was required, the defendants were granted an ample period of time in which to submit summaries of those documents and their contents pursuant to Rule 1006 of the Federal Rules of Evidence.[4] Plaintiffs were then granted an opportunity to review the underlying documents and to object to their admissibility in evidence or to the accuracy of the summary.[5]

Throughout the process which was thus undertaken, the plaintiffs focused their objections on deficiencies in underlying documentation to support the totals of expenditures set forth on the summaries, which totals would have, if fully supported, completely accounted for all the revenues which were realized prior to bankruptcy. Thus, in their initial objection to the summarization, the plaintiffs pointed out deficiencies in underlying documentation which fell some $88,000 short of the totals purporting to be shown on the defendants' summaries.[6] After the submission of some

---

1. Which provides as follows: "The court shall grant the debtor a discharge unless ... the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."

2. Actually, the amount which must have been available to defendants in this year preceding bankruptcy was much larger in amount, some $1.7 million, for, in purporting to account for the diminution of these assets, defendants, purport generally, albeit insufficiently, to account for the disposition of some $1.7 million.

3. See Section 541 of the Bankruptcy Code.

4. Further, in order to ensure that the defendants were granted the maximum of due process, the court orally advised counsel for defendants at the outset of the proceedings that a general explanation, unsupported by documentation, would be insufficient.

5. "We think that the framers of the rule clearly contemplated a pre-trial resolution of any issues that may be raised concerning the use of summaries. By requiring that the underlying documents be made available to opposing counsel,

the rule encourages counsel to eliminate objectionable matter and to stipulate to the form of the summary. Through this process the frequency of objections such as those raised here should be greatly reduced." *United States v. Smyth*, 556 F.2d 1179, 1184, n. 12 (5th Cir.1977).

6. In their initial objection filed to the defendants' summaries of expenditures for the time period in question, plaintiffs pointed out a deficiency of some $63,000 between the summary and the underlying documents according to the below schedule:

| Month | Summary | Checks Provided |
|---|---|---|
| January, 1985 | $ 53,801.93 | $ 44,239.15 |
| February, 1985 | 48,819.39 | 60,576.11 |
| March, 1985 | 69,351.95 | 53,750.28 |
| April, 1985 | 84,126.74 | 36,079.54 |
| May, 1985 | 17,036.45 | 16,657.30 |
| June, 1985 | 8,514.22 | 6,612.17 |
| Totals | $281,650.68 | $217,914.55 |

It was further pointed out that, with respect to March, 1985, there was an additional "unexplained debit in the amount of $25,000." In the hearing held by the court on October 30, 1987, the defendants were able to produce additional

additional documentation,[7] the contentions of the plaintiffs, presented at a hearing on October 30, 1987, were further narrowed to a sum of $78,250.50.[8] A subsequent, post-hearing production of documents accounted for an additional sum of $19,000, leaving approximately $58,000 not accounted for.[9]

■ The legal question which is thus presented to the court is whether the failure to account for $58,000 in assets in the form of income is significant when the total income for the period in question is in excess of $1 million.[10] The defendants have contended that, in view of the expanse and complexity of their business operations, involving more than one enterprise, the failure—if any—to account for a relatively small amount of monies should be regarded by the court as *de minimis* and the defendants should accordingly be granted their discharges in bankruptcy.[11] The plaintiffs, on the other hand, cite decisional authority which holds that much lower quantities of unaccounted-for monies or value—sums as low as $22,000—can provide grounds for denying discharges in bankruptcy.[12] Under appropriate circumstances, this court has held, on prior occasion, that failure to account for as little as $7,000 in value of assets can warrant the denial of a discharge in bankruptcy.[13] In yet other cases, values of similar magnitude to those at bar have been regarded as predicates for denial of discharges in bankruptcy, even when the defendants have contended, as in the action at bar, that the court should accept a general explanation for the fraction of value whose diminution cannot be explained with particularity.[14] In this action, the defendants contend, in part, that the court should regard the unaccounted for portions of the income as living expenses and, as a matter of pragmatism, hold that there is no significant failure to account for the diminution of assets to meet liabilities.[15] This court agrees with the principle that, when the issue of failure to account is with respect to an amount of value which makes the case for denial of discharge close and borderline, the authorities repose an ample discretion in the bankruptcy court. "Just what constitutes a satisfactory explanation has not been expressly defined, but it probably means that the bankrupt must explain his losses or deficiencies in such a manner as to convince the court of good faith and businesslike conduct." 1A Collier on Bankruptcy, Paragraph 14.59, p. 1436 (14th ed. 1976). "An

documents which reduced the unaccounted-for sum to $78,250.50. The defendants were granted leave to attempt to supply documentation such as would account for this amount subsequent to the hearing. Both parties recognize, in their respective posttrial briefs, that the posttrial submission of documents purported to account for—at most—$19,805.65 in expenses and that, accordingly, $58,444.85 remains unexplained.

7. See note 6, *supra.*

8. See note 6, *supra.*

9. See note 6, *supra.*

10. See note 6, *supra.*

11. "[W]hen plaintiffs are discussing the $58,000, plaintiffs do not want the court to consider it in relation to the $1,700,000.00. On the other hand, plaintiffs do want the court to treat the $1,700,000.00 as significant in and of itself, as evidence that defendants were engaged in a large business operation which demanded stricter accounting measures than those practiced by defendants. It seems patently unfair to treat both figures in isolation." Defendants' reply brief, pp. 3–4.

12. See, e.g., *In re Yokley,* 61 B.R. 198 (Bkrtcy.W. D.Wis.1987).

13. See *Matter of Foglesong,* In Bankruptcy Nos. 76–B–222–SJ and 76–B–223–SJ (Bkrtcy.W.D.Mo. July 6, 1977), affirmed, Civil Action No. 77–6068–CV–SJ (W.D.Mo. April 27, 1978), relevantly quoted in *Matter of DeGase,* 68 B.R. 504, 508–509 (Bkrtcy.W.D.Mo.1986) ($7,602.92 unexplained).

14. See *Matter of Simone,* Adversary Action No. 83–0021–1 (Bkrtcy.W.D.Mo. Nov. 14, 1983), affirmed, Civil Action No. 83–1410–CV–W–5 (W.D.Mo. Aug. 10, 1984) ($160,000 unexplained); *Matter of DeGase,* 68 B.R. 504 (Bkrtcy. W.D.Mo.1986) ($30–50,000 unexplained); *Matter of Newcomb,* 51 B.R. 276 (Bkrtcy.W.D.Mo. 1985), affirmed 75 B.R. 4 (W.D.Mo.1985) ($227,-000 unexplained).

15. "According to plaintiffs' characterization of this matter, however, it now appears as though the defendants' discharge is contingent upon their ability to document, *by cancelled checks,* all disbursements included in the $1.7 million figure." Defendants' reply brief, p. 2.

explanation which is based mostly upon an estimate of the bankrupt, founded upon nothing by way of verification or affirmation by means of books, records, or otherwise has been held unsatisfactory. Even though the underlying facts referred to by a bankrupt may suggest a plausible explanation, the testimony may be so general as to be insufficient. More is required of the bankrupt in the way of explanation than mere generalities." *Id.*, pp. 1436–1437. In the action at bar, only a minority of the value represented by the postpetition income is the subject of a general explanation which is unsupported by any underlying documents. Yet, it is a significant amount; a failure to account for such a magnitude of assets would make of this particular ground for denial of discharge a virtual nullity in the vast majority of bankruptcy cases. To be assured that $46,000 to $60,000 in assets may remain unaccounted for is more than the bankruptcy courts can lawfully offer to creditors. This is especially so when the amounts which are not accounted for were generated shortly prior to the chapter 7 proceeding and thus would have been property of the bankruptcy estate. Further, under the applicable rules, the debtors were required to explain fully and clearly prior to the hearing on discharge all income and expenditures gained and expanded by them before commencement of the chapter 7 proceedings.[16] They failed and refused to do so, despite being adequately apprised of their duty to do so.[17]

█ The facts of this case thus clearly except the debtors from the rule which would permit a discretionary grant of dis-

charge even when a ground for denial of discharge exists. There is no real issue that an appreciable sum of money has not been accounted for. In their posttrial brief, the defendants admit that sum to be $58,000—a significant sum of money in any bankruptcy case, enough to make a down payment on a new business, or to sustain a family's living expenses for a year or so, and too much for a bankruptcy court simply to ignore. The case authorities have frequently repeated the aphorism that bankruptcy entitles honest debtors to a fresh start, not a head start. And it is perhaps for that reason that the governing statute regards "*any* loss ... or deficiency of assets" (emphasis added) which is insufficiently explained to constitute a ground for denial of discharge. Further, in prior cases in which this court has exercised its discretionary powers to grant discharge, the potential asset of the estate which provided the ground for denial was recovered for the benefit of creditors. *Matter of Jones*, 67 B.R. 484, 486 (Bkrtcy W.D.Mo. 1985). But that is not the case at bar.

█ It is commonly said, however, that the existence of grounds for the denial of discharge, albeit a condition necessary to the actual denial of discharge, is not a sufficient condition; that it remains within the discretion of a bankruptcy court to grant a discharge even when grounds for denial of discharge are demonstrated to exist.[18] Under this rule, it is appropriate for the court to consider that the debtors' prepetition debt is of such magnitude that denial of a discharge would make life virtually impossible for them.[19] And, in this

16. See note 1, *supra*.

17. See note 4, *supra*.

18. "It is commonly said that even when grounds for the denial of discharge exist, it is still within the discretion of the bankruptcy court as to whether discharge should actually be denied." *Matter of Borron*, 29 B.R. 122, 128 (Bkrtcy.W.D. Mo.1983). "It remains discretionary with a bankruptcy court whether to grant or deny discharge." *Matter of Carroll*, 70 B.R. 143, 145 (Bkrtcy.W.D.Mo.1986). "The existence of such a ground [for denial of discharge], however, is not a sufficient condition to warrant a denial of discharge in bankruptcy, although it is a neces-

sary one. It remains within the discretion of the bankruptcy court to grant or deny the discharge in bankruptcy." *Matter of Jones*, 67 B.R. 484, 486 (Bkrtcy.W.D.Mo.1985). "[E]ven if a ground for denial of discharge exists ..., it is still within the discretion of the court to grant or deny a discharge." *In re Woodhull*, 30 B.R. 83, 87 (Bkrtcy.E.D.Ark.1983).

19. See and compare *Matter of Jones*, 67 B.R. 484, 487 (Bkrtcy.W.D.Mo.1985), to the following effect:

"The debtors had the intent to hinder, delay, and defraud creditors when they made the transfer of March 28, 1984. The coincidence

case, the debtors seek to discharge debts of some considerable magnitude.[20] But this consideration must, in turn be weighed against the degree of heinousness evidenced by the circumstances of the violation of the bankruptcy laws which constitutes the ground for denial of discharge. In this case, the violation carried some high degree of gravity in that it entailed violations of the Code's rules of disclosure which must be obeyed if the bankruptcy laws are to be enforced so as to achieve their great social purpose. Without compliance with the rules requiring accurate periodic disclosure, an endless array of abuses is possible. See., e.g., *In re Missouri*, 22 B.R. 600, 603 (Bkrtcy.E.D.Ark.1982). And this court has observed on prior occasion that it is a matter of premier importance for the bankruptcy court to prevent abuse of the bankruptcy laws. See *Matter of Bruno*, 68 B.R. 101, 103 (Bkrtcy.W.D.Mo. 1986), to the following effect:

"Bankruptcy has too grand and lofty a purpose for such misuse. The framers of our national constitution penned the bankruptcy power into its articles as one of the most significant—if, indeed, not the most significant—of the protections of our way of life. The fundamental and paramount importance of bankruptcy laws can quickly be grasped if one simply contemplates a system in which each citizen was permitted only one economic life and in which any single economic failure would make one a debtor for life, or nearly so, regardless of the potential future benefits to himself and his society which his industry and innovative genius might otherwise have created. Such a legal system would frustrate and still the creative spirit which lies at the heart of our democratic society. On the other hand, however, if the bankruptcy process is permitted to be abused by those whose purposes are not in consonance with this ideal, the effect tends to be the same as if proper use of the bankruptcy laws

were wholly suppressed. For the bad reputation of the bankruptcy system which thus develops discourages its use by those who would prefer to preserve some semblance of their good name."

Accordingly, in balancing these juxtaposed principles, this court determines that the degree of fault, generally, outweighs the interest in granting the debtors freedom from their past debts. The bankruptcy court cannot encourage violations of rules compelling periodic disclosure without endangering the cardinal purposes of our legal system. In so doing, it is recognized that:

"in determining the issue of who is entitled to a discharge in bankruptcy, the bankruptcy courts must make one of the most important, critical and sensitive decisions known to American jurisprudence. Fine distinctions must be painstakingly and accurately—yet promptly— perceived. For it is clear that tempering justice with mercy in granting discharge under some circumstances will promote the ideals of giving struggling debtors new economic life; in others—not far removed factually, perhaps, from these situations—it can only stultify and defeat that ideal by leaving it open for those who would practice artifice and deception to abuse the bankruptcy system. And experience teaches that when the permutations of the law promote abuse, the bankruptcy system tends to become a haven for the abusers, for others who might otherwise, in their hour of need, avail themselves of the process, refrain from doing so out of shame and fear for their reputation."

*Matter of Carroll*, 70 B.R. 143, 145–146 (Bkrtcy.W.D.Mo.1986).

 It has been for these reasons, perhaps, that the courts have, recognizing the special expertise of the bankruptcy court in matters of this type and its unique opportunity to see the witnesses and gauge their

of many badges of fraud is too great to make any other finding in that respect. But the great indebtedness owed by the debtors would make life nearly impossible for them if the discharge were not granted.... Accordingly, ... the plaintiff's objection to the debtors'

discharge in bankruptcy be, and it is hereby, denied." (Footnotes omitted).

20. The debtors schedule $2.8 million in unsecured debt, much of which is "contingent."

credibility, traditionally granted a very wide discretion to the bankruptcy courts in the granting or denying of discharges.[21] In the actions at bar, however, this court must consider whether the exercise of its discretion should be restricted in light of two recent district court decisions which appear to impose a wholly new standard of review and consequently to evince an unprecedented hostility to bankruptcy court orders and judgments denying discharges in bankruptcy. In these decisions, *Matter of Dowell*[22] and *Matter of Richardson*,[23] the district court rejected the time-honored standards for review of bankruptcy court findings of fact by holding that "mixed findings of fact and law" are subject to *de novo* review by the district court.[24] Thus, the ultimate findings of fact made by the bankruptcy court are subject to *de novo* scrutiny by the district court, which may upset bankruptcy findings even when they are supported by substantial evidence.[25] There can be little question that the application of such a standard eradicates any

ambit of discretion which may have formerly been exercised by bankruptcy courts in determining objections to discharge.[26] For, in both *Matter of Dowell, supra,* and *Matter of Richardson, supra,* review was so thorough that the district court made credibility determinations opposed to the bankruptcy court's credibility determinations.[27] In both cases, judgments of the bankruptcy court denying discharges in bankruptcy were reversed and remanded to the bankruptcy court for additional findings and the entry of judgment in accordance with the debtors' contentions.[28]

This court, of course, is not qualified to indulge in any critical analysis of the district court decisions and does not intend to do so. This court has repeatedly emphasized its duty not to question the district court's decisions, but rather to follow them in any and all cases in which they have application. *Matter of Burstein–Applebee Co.,* 63 B.R. 1011, 1022 (Bkrtcy.W.D.Mo.

---

**21.** "Because the Referee is in a superior position to make the proper determination of an issue of fact, it has been held that he has broad discretion in granting or refusing discharge." *In re Brown,* 314 F.Supp. 947, 954–955 (W.D.Ark. 1970), affirmed 444 F.2d 49 (8th Cir.1971). "The question of the right to a discharge is addressed to the sound discretion of the bankruptcy court, with the exercise of which, except in cases of gross abuse, an appellate court will not interfere." *Burchett v. Myers,* 202 F.2d 920, 926 (9th Cir.1953). This principle has been held to have special application to the type of case at bar. "Trial courts have wide discretion in determining whether books or records are adequate under the terms of the statute and the facts of each case. This discretion should not be disturbed unless there has been a clear abuse of discretion." *Goff v. The Russell Company,* 495 F.2d 199, 202 (5th Cir.1974).

**22.** See *United States of America v. Dowell,* 61 B.R. 75 (Bkrtcy.W.D.Mo.1986), more recently reversed and remanded in an unreported district court decision.

**23.** See *United States of America v. Richardson,* 78 B.R. 960, 962 (W.D.Mo.1987) ("[A]s she testified she was *unable* to pay any of the $3,842.79 ordered, she believed that she had no obligation under the bankruptcy court's June 21, 1985, order.") But, in its opinion, the bankruptcy court had held this testimony to be deficient.

**24.** "The district court must independently determine questions of law *or mixed questions of law*

or fact." *In re Richardson,* 78 B.R. 960, 961 (W.D.Mo.1987) (Emphasis added). This view is supported in part by *Matter of Hammons,* 614 F.2d 399, 403 (5th Cir.1980) ("The district court ... must independently determine the correctness of *the ultimate* legal conclusion adopted by the bankruptcy judged *on the basis of the facts found.*" [Emphasis added].). Cf. the authority cited at p. 1001 of the text of this memorandum. And *Hammons, supra* at 402–403, goes on to say that, "[t]he bankruptcy judge is the trier of fact who sees and hears the witnesses, makes credibility determinations and resolves conflicts in the proof."

**25.** Thus, in the *Dowell* case, the district court reversed this court's finding that the debtor had intentionally violated orders of this court directing her to file schedules and statements of affairs, explicitly giving credence to the debtor's defense of "inability to comply," based solely on her testimony, which this court had explicitly found to be not credible. In the *Richardson* case, the district court, in a similar vein, found that the debtor, who had failed to comply with a turnover order, could reasonable have believed that she was unable to comply even though this court had found her testimony to this effect deficient and incredible.

**26.** Cf. note 21, *supra.*

**27.** Cf. note 25, *supra.*

**28.** Cf. note 25, *supra.*

1986). The sole question before this court at this time is whether *Matter of Dowell, supra,* and *Matter of Richardson, supra,* have application in these actions so as to require the bankruptcy court to accept the testimonial explanations of the debtors as to the disposition of their assets which are not supported by any documentation and, accordingly, to grant their discharges in bankruptcy.[29]

In this regard, 'the traditional authorities have recognized the special duty of a bankruptcy court to carefully weigh the testimony of debtors who are attempting to account for the disposition of assets.[30] Without the ability to disbelieve such testimony, when it is appropriate to do so, bankruptcy courts would be wholly at the mercy of those who intend to abuse the system.[31] "To suffer such an ... abuse of its own processes without denying discharge would be a signal to all that the court will easily tolerate those abuses. The preservation of the bankruptcy process for the demonstrably honest and struggling debtors is too vital and necessary to permit the court to indulge itself in such unwarranted leniency." *Matter of Carroll, supra* at 146.

Further, the employment of such a strict standard of review as was employed in *Matter of Dowell, supra, and Matter of Richardson, supra,* would work to equate the quality of the duties of the district court and the bankruptcy court so that the character of the latter's decisions would be almost certain to be regarded as "judicial," rather than "executive" or "administrative," and thus to participate in the federal judicial power in Article III of the Constitution. The authorities acknowledge the principle that reviewing courts utilize stricter standards of review as the subject matter of the cases under review more closely approach the competence and expertise of the reviewing court.[32] Thus, the exercise of specialized administrative power remote from judicial proceedings is frequently committed to agency discretion or else subjected to review only under the "substantial evidence" standard.[33] It seems to have been with the idea that the bankruptcy court belonged in such a category that the Supreme Court of the United States, in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), observed that, inter alia, review of the bankruptcy court's final orders and judgments under the "clearly erroneous" standard was one of the features of the system under the Bankruptcy Reform Act of 1978.[34] Subsequent decisions have held that the "clearly erroneous" standard of review is perfectly consistent with the bankruptcy court's non-Article III status. *In re Morrissey,* 717 F.2d 100 (3rd Cir. 1983); *Kalaris v. Donovan,* 697 F.2d 376 (D.C.Cir.1983). But, the "clearly erroneous" standard of review, properly interpreted, does not admit of *de novo* review.

---

**29.** Cf. note 25, *supra.*

**30.** See 2 Collier on Bankruptcy, Paragraph 23.-10, p. 5865, n. 73 (14th ed. 1976), to the following effect:
"The defendant's sworn denial of ability to comply is not conclusive, although it may be given due consideration, and the court ... may reject improbable explanations." "The stories of bankrupts who conceal assets have assumed a form almost as conventional as the plots one finds in the plays of Plautus and Terence ... they contain little more than standardized forms of falsehood ... neither credible nor interesting." *Matter of Abesbaum,* 70 F.2d 628, 629 (2d Cir.1934).

**31.** And, ordinarily, the findings of any trial court on the issue of credibility are entitled to deference and are not subject to *de novo* review. "[T]he District Court [bears] the same relationship to the Bankruptcy Court as we usually do to the District Courts—it [sits] as an appellate tribunal, not as a finder of fact. The deference owed by appellate courts to finders of fact is at its highest where the issue turns on the resolution of a direct conflict between live witnesses." *In re Windle,* 653 F.2d 328, 331 (8th Cir.1981).

**32.** "Courts usually substitute judgment on the kind of questions ... that are within their special competence, but on other questions they limit themselves to deciding reasonableness." 5 K. Davis, *Administrative Law Treatise,* Section 29.1, p. 332 (2d ed. 1984).

**33.** *Id.*

**34.** See *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 53, n. 5, 102 S.Ct. 2858, 2862 n. 5, 73 L.Ed.2d 598 (1982). See also *Kalaris v. Donovan,* 697 F.2d 376, 388 (D.C.Cir. 1983).

See 5 K. Davis, *Administrative Law*, Section 29.5, p. 352 (2d ed. 1984), to the following effect:

> "Even when a district judge finds an 'ultimate fact,' a court of appeals is in error when it makes its own finding, for the 'clearly erroneous' standard under Rule 52(a) applies to all findings, including findings of ultimate facts."

Such a standard of review can only equate the type of workload of the reviewed court with that of the reviewing court when, as in the *Dowell* and *Richardson* cases, *supra*, it is not a report of recommended findings of fact and conclusions of law which is reviewed, but a final judgment and when the action taken was to remand the case to the reviewed court with the possibility of entry of a judgment on remand which would not be further reviewed.[35] Such action identifies the duties of the reviewed court as distinctly "judicial," as opposed to "administrative" or "executive," the assignment of which, according to past constitutional decisions, may be sufficient —even without reappointment of the court's sub-Article III judges [36]—to cause a court to "mature" into an Article III court. See *Glidden Co. v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); *Kalaris v. Donovan, supra; Matter of Richardson*, 52 B.R. 527, 535 (Bkrtcy.W.D.Mo.

1985); *Matter of Transport Clearings–Midwest, Inc.*, 41 B.R. 528, 538–39 (Bkrtcy. W.D.Mo.1984); 1 Moore's Federal Practice, Paragraph 0.4[1], et seq., 0.4[4], p. 79.[37] In its past decisions, this court has eschewed action which could be interpreted as attempting to classify the bankruptcy court as an Article III court. See, e.g., *Matter of Richardson, supra*, at 533 ("[T]he bankruptcy court must be circumspect in interpreting the law delegating powers to it lest it be accused of arrogating Article III powers to itself."); *Matter of Transport Clearings–Midwest, Inc., supra;* See also *Matter of Golden Gulf, Ltd.*, 73 B.R. 685, 689 (Bkrtcy.E.D.Ark.1986), to the following effect:

> "The bankruptcy courts, under such circumstances, have an interest equal to that of the district court in preventing Article III status from being conferred without a rational and direct decision by the appropriate branch of Government."

Accordingly, this court declines to grant the conclusionary testimony of the debtors complete and undaunted sway over the issues at bar. Further, even if the testimony were wholly believed, the authorities cited above hold that, when it is unsupported by sufficient documentation, it constitutes an unsatisfactory explanation for the diminution of assets.[38] The intention of the debt-

**35.** "Accordingly, to direct this court to render a judgment on an issue which the district court considers to be so directly within its competence that its findings must supersede those of this court is to direct that this court exercise the power of the district court—the federal judicial power under Article III ..." *Matter of Dowell*, 82 B.R. 998 (Bkrtcy.W.D.Mo.1987).

**36.** "[T]he Court of Claims [has] all of the characteristics of an Article III court ... Since that time the Article III jurisdiction of the court has been enlarged ... I see nothing in the argument that [these changes] require new presidential appointments." *Glidden Co. v. Zdanok*, 370 U.S. 530, 586–89, 82 S.Ct. 1459, 1491–93, 8 L.Ed.2d 671 (1962) (Opinion of Clark, J.).

**37.** These authorities indicate that the assignment of the federal judicial power in any quantity or any form to a non-legislative court works, according to the governing authorities, to create an Article III tribunal. See *Matter of Transport Clearings–Midwest, Inc.*, 41 B.R. 528, 538, n. 28 (Bkrtcy.W.D.Mo.1984), and authorities therein cited.

**38.** "An explanation which is based mostly upon an estimate of the bankrupt, founded upon nothing by way of verification or affirmation by means of books, records or otherwise has been held unsatisfactory. Even though the underlying facts referred to by a bankrupt may suggest a plausible explanation, the testimony may be so general as to be insufficient. More is required of the bankrupt in the way of explanation than mere generalities." 1A Collier on Bankruptcy, Paragraph 14.59, pp. 1437–38 (14th ed. 1976). "The purpose of this exception to the bankruptcy act is to provide insurance against the disappearance of substantial portions of the bankrupt's assets without explanation. Therefore, regardless of the intent of the bankrupts, if they are unable to explain satisfactorily the disappearance of a significant part of their assets, discharge must be denied." *Matter of DeGase*, 68 B.R. 504, 509 (Bkrtcy.W.D.Mo. 1986), quoting *Matter of Foglesong, supra*, note 13.

ors in this regard is irrelevant.[39] It is the inescapable duty of the bankruptcy court, whatever its status in terms of Article III of the Constitution, to enforce these crucial letters of the bankruptcy law. In these actions, as opposed to the *Dowell* and *Richardson* cases, *supra*, the issue of *contumacious* disregard of the bankruptcy court's orders is not involved. Accordingly, the authorities which place contempt actions within the special competence of the district court may not be applicable. The type of case at bar has nearly always been held to be within the special competence of the bankruptcy court. "Trial courts have wide discretion in determining whether books or records are adequate under the terms of the statute and the facts of each case. This discretion should not be disturbed unless there has been a clear abuse of discretion." *Goff v. The Russell Company*, 495 F.2d 199, 202 (5th Cir.1974). It is therefore the determination of this court that the defendants' discharges in bankruptcy should be denied.

---

**39.** See note 38, *supra*. "[I]t appears that the ... element of intent ... is not required here." 1A Collier on Bankruptcy, Paragraph 14.59, p. 1433 (14th ed. 1976).